OPINION OF THE COURT BY JUSTICE HUGHES
Michael Todd Hilton appeals as a matter of right from a judgment of the Hardin Circuit Court sentencing him to life imprisonment for murder, first-degree assault, second-degree assault, operating a motor vehicle under influence of alcohol which impairs driving ability, and for being a first-degree persistent felony offender. Hilton alleges that the trial court erred by: 1) failing to grant a change of venue; 2) declining to suppress a witness's statement; 3) refusing to grant a continuance;
*5 4) failing to remove jurors for cause; 5) denying his request for a mistrial; and 6) by permitting the Commonwealth to inquire of witnesses during the penalty phase what sentence they believed appropriate for Hilton's crimes. For the following reasons, we affirm the judgment and sentence.
FACTS AND PROCEDURAL HISTORY
During the evening of June 22, 2014, Jason Hall was driving down Deckard School Road in Hardin County, Kentucky. After reaching the intersection of Deckard School Road and Patriot Parkway, Hall observed an overturned burning truck. As Hall drove towards the burning wreck he observed a cooler and beer cans in the road. After Hall exited his vehicle, he was approached by Michael Todd Hilton who told Hall that he was unable to find his brother, Kyle Hilton.[1] Hall informed Hilton that he would be with him momentarily, after he called 911 to request emergency assistance. Hilton tried to persuade Hall not to call 911, but Hall refused and contacted the authorities.
Faith Terry and Jason Combs also arrived on the scene of the collision. Terry observed a truck flipped upside down and a mangled orange Mustang. Hearing coughing from the Mustang, Terry and Combs attempted to aid the injured driver, Brianna Taylor, but were unable to assist Taylor's passenger, Mickayla Harig, who was pinned down by wreckage from the collision. Subsequently, Terry and Combs overheard Hilton yelling for help for his brother Kyle, who was also injured in the accident. While attending to Kyle, Hilton admitted to not stopping at the intersection's stop sign and that he had been drinking. Terry also observed beer cans strewn amongst the wreckage.
After the arrival of emergency personnel, Hilton and his brother were transported to the University of Louisville Hospital for medical treatment. Prior to his transport to the hospital, Hilton admitted to emergency personnel that he and Kyle had been drinking heavily. At the hospital, physicians examined and treated Hilton for minor injuries. Kyle was admitted at the hospital and received treatment for five days prior to being discharged.
Due to Taylor and Harig being trapped in their damaged vehicle, they were transported to the University of Louisville Hospital after Kyle and Hilton. Both women were treated for severe injuries. Among other injuries, Harig suffered a traumatic brain injury and was hospitalized for approximately 22 days prior to being discharged. As for Taylor, her extensive injuries induced cardiac arrest. While doctors were initially able to restart Taylor's heart, blood loss from organ damage caused her heart to arrest a second time, and they were not able to revive her.
Responding to the scene of the crime, Officer Thomas Cornett of the Hardin County Sheriff's Office observed beer cans and a cooler near Hilton's damaged vehicle. Officer Cornett suspected that Hilton might have been operating his vehicle while under the influence of alcohol and thus contacted the hospital to have Hilton's blood collected for future laboratory examination. Lab results later established that Hilton's blood alcohol level at the time of the collection was approximately 2.33g/100ml; more than twice the legal limit to operate a motor vehicle.
In July 2014, the Hardin County grand jury indicted Hilton for murder; first-degree assault (two counts); operating a motor vehicle under the influence of intoxicants, *6 first offense in a five-year period, aggravated; and for being a first-degree persistent felony offender. After a trial in June 2015, Hilton was convicted of murder, first-degree assault, second-degree assault, and operating a motor vehicle under influence of alcohol which impairs driving ability. Following the penalty phase of his trial, the jury found Hilton to be a first-degree persistent felony offender and recommended concurrent sentences of life imprisonment for murder, thirty-five years' imprisonment for first-degree assault, ten years' imprisonment for second-degree assault, and thirty days' imprisonment for operating a motor vehicle under influence of alcohol which impairs driving ability. The trial court sentenced Hilton to life imprisonment in conformance with the jury's recommendation.
ANALYSIS
I. The Trial Court Did Not Abuse Its Discretion in Denying Hilton's Motion For Change of Venue.
Hilton contends that the trial court erred by not granting his motion for a change of venue.[2] Prior to trial, Hilton made a motion for change of venue, contending that extensive media coverage and widespread local knowledge of his actions prevented him from having a fair trial in Hardin County. Hilton requested that the trial be conducted in another county or alternatively that jurors be summoned from other counties or that a survey be sent out to determine community opinion.[3]
Subsequently, the trial court conducted two evidentiary hearings to consider Hilton's motion. In support of his motion, Hilton submitted two affidavits and multiple exhibits demonstrating the pretrial attention surrounding the death of Brianna Taylor. Hilton's exhibits included photographs of a roadside memorial to Taylor, Louisville area news reports about Taylor's death, and a copy of a Facebook page memorializing her and her brother, Brice Taylor.[4] In opposition to Hilton's motion, the Commonwealth submitted four counter-affidavits. Additionally, the Commonwealth submitted the 2010 Census figures for Hardin County, the daytime population of Fort Knox, and the daily circulation of the Elizabethtown News-Enterprise.[5]
After considering the evidence presented by both parties, the trial court denied Hilton's motion in a detailed order, subject to reconsideration if Hilton renewed the motion during voir dire. The trial court concluded that the pretrial media coverage of this case was not reasonably likely to prevent a fair trial in Hardin County. Additionally, the trial court enumerated seven reasons why a change of venue was unnecessary: 1) Hardin County, with a population *7 of approximately 105,000 residents, is relatively large and has numerous cities and school districts; 2) Hardin County is a transient community, where a substantial number of citizens do not have pre-existing ties or relationships with the residents of the county; 3) the nearby presence of the Louisville media market diminishes the impact that a single tragic case has on the public consciousness of potential jurors in the county; 4) the internet coverage of the case is not necessarily relevant because it cannot be quantified to determine the impact within Hardin County; 5) roadside memorials, such as the one to Taylor, are common occurrences in Kentucky and the memorial does not name Hilton nor is its lettering readable to passing motorists; 6) the jury pool from which Hilton's petit jury would be formed was instructed during jury orientation not to watch, listen, or read any media or internet accounts of any criminal cases occurring in Hardin County during their term of service; and 7) the Hardin Circuit Court had been able to seat a fair and impartial jury in similar cases of media exposure without resorting to extraordinary measures such as change of venue or summoning jurors from adjacent counties.
"Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, a change of venue must be granted when 'it appears that the defendant cannot have a fair trial in the county wherein the prosecution is pending." Sluss v. Commonwealth , 450 S.W.3d 279, 285 (Ky. 2014) (quoting Brewster v. Commonwealth , 568 S.W.2d 232, 235 (Ky. 1978) ). Additionally, Kentucky Revised Statute (KRS) 452.210 provides that the defendant is entitled to a change of venue if the presiding judge is satisfied that the defendant cannot receive a fair trial in the county where the prosecution is pending. "It is not the amount of publicity which determines that venue should be changed; it is whether public opinion is so aroused as to preclude a fair trial." Foster v. Commonwealth , 827 S.W.2d 670, 675 (Ky. 1991) (quoting Kordenbrock v. Commonwealth , 700 S.W.2d 384, 387 (Ky. 1985) ). In considering a motion for change of venue, the trial court is vested with "wide discretion," and its decision will not be overturned absent an abuse of discretion. Wood v. Commonwealth , 178 S.W.3d 500, 513 (Ky. 2005) (citing Hurley v. Commonwealth , 451 S.W.2d 838 (Ky. 1970) ). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." Goodyear Tire & Rubber Co. v. Thompson , 11 S.W.3d 575, 581 (Ky. 2000) (citing Commonwealth v. English , 993 S.W.2d 941, 945 (Ky. 1999) ).
Hilton's contention that the trial court erred in denying his motion for change of venue is without merit. Speaking in sweeping terms, Hilton claims that "any indicia of impartiality on the part of the jurors must be disregarded. It is hard to fathom an atmosphere more inflammatory than a community trying a man charged with murder of a young girl who dies based upon a DUI accident." While the facts of this case are clearly tragic, vehicular homicides involving drivers under the influence are, sadly, not uncommon and the publicity complained of by Hilton was not so prolific or prejudicial as to rise to a presumption of prejudice. Rather, after considering the totality of circumstances, we cannot conclude that the trial setting was inherently prejudicial.
Nor has Hilton established a reasonable likelihood that pretrial publicity actually prejudiced the jury pool. Hilton contends that he was "undeniably prevented a fair trial," because of the thirty-six jurors initially called for service, thirty-two responded that they heard some media *8 coverage of the case. This is insufficient as "the mere fact that jurors may have heard, talked, or read about a case is not sufficient to sustain a motion for change of venue, absent a showing that there is a reasonable likelihood that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant." Brewster v. Commonwealth , 568 S.W.2d 232, 235 (Ky. 1978) ; see also Irvin v. Dowd , 366 U.S. 717, 722-23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (It is not required that "jurors be totally ignorant of the facts and issues involved" or that they cannot have "some impression or opinion as to the merits of the case[,]" so long as they can set aside that "impression or opinion and render a verdict based on the evidence presented in court."). In the case at bar, the trial court carefully examined the potential jurors as to their knowledge of the case due to pretrial media coverage. To ensure Hilton's right to a fair jury, the trial court removed those jurors who had formed an opinion based on media coverage. On the record before us, we conclude that the trial court did not abuse its discretion in denying Hilton's motion for change of venue.
II. The Trial Court Did Not Abuse Its Discretion in Denying Hilton's Motion to Exclude a Statement He Made to Jason Hall.
Hilton argues that the trial court erred by permitting the Commonwealth to present the testimony of Jason Hall concerning a statement Hilton made to him the night of the collision.[6] Hilton claimed that the admission of this incriminating statement was a violation of Kentucky Rule of Criminal Procedure (RCr) 7.24 and the trial court's discovery order. Further, Hilton contends that the introduction of this statement precluded him from properly preparing and presenting a defense and denied him his right to a fair trial.
On June 1, 2015, while preparing for trial, the Commonwealth reviewed 911 call sheets, which listed the telephone numbers of individuals who had called for emergency services the night of the collision. The Commonwealth contacted Hall who revealed (for the first time) that he had been present at the scene of the vehicle collision and that Hilton had told him not to call 911. After receiving this information, the Commonwealth alerted the court and defense counsel the following day by submitting a summary of Hilton's statement to Hall as a supplemental discovery response.
Hilton moved to exclude Hall's statement, arguing that the Commonwealth had violated RCr 7.24 by failing to discover and turn over the statement until one week before the trial. He requested that the statement be excluded or, alternatively, that the trial court continue the case to allow time to "properly investigate and consider" the statement and Hall.
After a hearing, the trial court denied Hilton's motion to exclude the statement. The trial court explained that the Commonwealth had an obligation under RCr 7.24(1) to timely disclose any self-incriminating, statements made by Hilton in advance of the trial. Further, according to the trial court's pretrial discovery order, the Commonwealth was obligated to disclose oral incriminating statements made by Hilton and known by the Commonwealth or its agents within thirty days of arraignment.
The trial court determined that the Commonwealth did not know of the existence *9 of the statement until June 1, 2015. Further, the trial court concluded that the Commonwealth did not act in bad faith in disclosure of the statement; nor was there any suggestion by Hilton that the Commonwealth had done so. Additionally, the trial court noted that the statement was not in the possession of an agency over which the Commonwealth's Attorney exercises control. The 911 call sheets were records maintained by the Hardin County 911, which is owned and operated by the Hardin County government, not a law enforcement agency. As the trial court explained, any 911 calls regarding the vehicle collision were a matter of public record and available to all parties.
Also, the trial court concluded that the Commonwealth's disclosure of Hall's intended testimony did not constitute a "surprise attack" on Hilton's trial strategy. Notably, Hilton declined the trial court's offer of an in-camera hearing, outside the presence of the Commonwealth's Attorney, to discuss his trial strategy and how Hall's testimony would undermine it. Additionally, after considering this Court's recent opinion in Trigg v. Commonwealth, 460 S.W.3d 322 (Ky. 2015), the trial court concluded that Hilton had "not demonstrated that either cross examination of Jason Hall or pre-trial inquiry of other witnesses will be rendered ineffective by the introduction of the statement at trial."
RCr 7.24 states in pertinent part that "[u]pon written request by the defense, the attorney for the Commonwealth shall disclose the substance, including time, date, and place, of any oral incriminating statement known by the attorney for the Commonwealth to have been made by a defendant to any witness." The Commonwealth is obligated to disclose incriminating statements of the defendant under RCr 7.24, "not only to inform the defendant that he has made these statements, as he should be clearly aware, but rather to inform the defendant (and to make sure his counsel knows) that the Commonwealth is aware that he has made these statements." Chestnut v. Commonwealth , 250 S.W.3d 288, 297 (Ky. 2008) (emphasis in original). "We review a trial judge's decision concerning discovery issues under an abuse of discretion standard." Brown v. Commonwealth , 416 S.W.3d 302, 308 (Ky. 2013) (citing Beaty v. Commonwealth , 125 S.W.3d 196, 202 (Ky. 2003) ).
Contrary to Hilton's assertions, it is clear that the Commonwealth did not violate RCr 7.24 or the trial court's discovery orders. It is uncontradicted that the Commonwealth did not know that Hilton had made an incriminating statement to Hall until June 1, 2015. Hall, a private citizen, was not an agent of the Commonwealth and his knowledge of Hilton's incriminating statement cannot be imputed to the Commonwealth. Once the Commonwealth learned of Hilton's statement to Hall it was immediately disclosed. Notably, through examination of the available 911 records, Hilton's counsel had the same opportunity as the Commonwealth to investigate Hall and his encounter with Hilton that night. Further, Hilton failed to identify to the trial court how he was supposedly prejudiced by Hall's testimony, even when offered an opportunity to present his argument in camera to avoid revealing trial strategy. Accordingly, we cannot disagree with the trial court's well-reasoned denial of Hilton's motion to exclude his statement to Hall.
III. The Trial Court Did Not Abuse Its Discretion in Denying Hilton's Motions for a Continuance.
Hilton contends that the trial court erred by failing to grant his multiple *10 requests to postpone the trial.[7] Hilton's trial was initially scheduled to begin on March 9, 2015. However, on January 28, 2015, Hilton requested that his trial be continued. The trial court acquiesced and rescheduled Hilton's trial for June 8, 2015.[8] Additionally, the trial court set a backup trial date of August 10, 2015.
Later, on May 15, 2015, the Commonwealth supplemented its original discovery disclosure by providing Hilton with the medical records for Kyle and Harig. These records formed the basis of Hilton's second motion to continue. Hilton acknowledged that there had been no fault on the part of the Commonwealth in turning over the medical records but, rather, delay by the hospital in providing the records to the Commonwealth. Once the Commonwealth received the medical records, it immediately mailed them to Hilton. Hilton maintained that there was insufficient time prior to trial to review the medical records.
The trial court responded to this argument by explaining that it was clear from the discovery that the Commonwealth had previously tendered in the form of an investigative report and emergency services records that Harig and Kyle had sustained injuries and that they had been treated at the University of Louisville Hospital. The trial court noted that Hilton could have subpoenaed the medical records rather than waiting for the Commonwealth to obtain them and turn them over in discovery. While the trial court understood Hilton's concerns, it concluded that the existence of the records was not a surprise and that two weeks would be sufficient time to review them. Additionally, the trial court explained that the alternate trial date of August 10, 2015, might not be available as a capital murder case was scheduled to be tried on that date.
Despite denying Hilton's motion, the trial court noted that if there was information in the records, discovered during Hilton's review that did constitute a surprise, the court would be willing to entertain a renewed motion for a continuance. Also, the trial court informed Hilton during an ex parte proceeding conducted after the hearing that funding could be obtained to hire an expert to help review the medical records. To expedite that process the trial court permitted Hilton to hire an expert immediately, rather than wait for the issuance of a written order allocating funding for this purpose.
A week later, as part of an alternative presented in Hilton's motion for change of venue, he orally requested to continue the trial so that a survey could be conducted to determine community opinion regarding his case. This request was denied. Additionally, three days before trial, Hilton requested that the trial court exclude the "don't call 911" statement he made to Hall or, alternatively, that the court grant him a continuance to investigate the statement and Hall. The trial court denied this final motion for a continuance.
Under RCr 9.04 the trial court, "upon motion and sufficient cause shown by either party, may grant a postponement of the hearing or trial." The trial court is vested with broad discretion in granting or refusing a continuance. Dishman v. Commonwealth , 906 S.W.2d 335, 339 (Ky. 1995)
*11 (citing Pelfrey v. Commonwealth , 842 S.W.2d 524 (Ky. 1993) ); see also Morris v. Slappy , 461 U.S. 1, 11-12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983) ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel.") (quoting Ungar v. Sarafite , 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964) ).
In Snodgrass v. Commonwealth , 814 S.W.2d 579 (Ky. 1991), overruled on other grounds by Lawson v. Commonwealth , 53 S.W.3d 534 (Ky. 2001), this Court noted that "[w]hether a continuance is appropriate in a particular case depends upon the unique facts and circumstances of that case." Id. at 581 (citing Ungar , 376 U.S. at 589, 84 S.Ct. 841 ).
Factors the trial court is to consider in exercising its discretion are: length of delay; previous continuances; inconvenience to litigants, witnesses, counsel and the court; whether the delay is purposeful or is caused by the accused; availability of other competent counsel; complexity of the case; and whether denying the continuance will lead to identifiable prejudice.
Id. (citing Wilson v. Mintzes, 761 F.2d 275, 281 (6th Cir. 1985) ); see also Bartley v. Commonwealth , 400 S.W.3d 714, 733 (Ky. 2013) ("Identifiable-prejudice is especially important.").
After considering the Snodgrass factors, it is clear that the trial court did not err in denying a continuance. While there had previously been a continuance granted at the request of both parties, granting an additional continuance of Hilton's case would have caused inconvenience for the trial court and witnesses. As noted by the trial court, it was not a given that the trial could have been moved to the August 10, 2015 date, and if not tried at that time, it is unknown when the case would have finally been presented to a jury. Moreover, as the trial court explained, the Commonwealth's intention to use medical records in this case was not a surprise and Hilton could have requested this information well in advance of the trial date. Further, Hilton obtained pretrial funding for an expert who was ultimately hired to review the questioned medical records. Finally, even at this juncture, years after Hilton's trial, he is unable to identify any specific prejudice he suffered by the trial court's refusal to grant him a continuance. Accordingly, we hold that the trial court did not abuse its discretion in denying Hilton's requests for a continuance.
IV. The Trial Court Did Not Abuse Its Discretion by Refusing Hilton's Motion to Excuse Jurors for Cause.
Hilton argues that the trial court violated his due process right to a fair trial by failing to excuse Jurors 601, 99, 21, and 229.[9] "Whether to exclude a juror for cause lies within the sound discretion of the trial court, and on appellate review, we will not reverse the trial court's determination 'unless the action of the trial court is an abuse of discretion or is clearly erroneous.' " Hammond v. Commonwealth , 504 S.W.3d 44, 54 (Ky. 2016) (quoting Ordway v. Commonwealth , 391 S.W.3d 762, 780 (Ky. 2013) ). To determine whether a juror should be stricken for cause, the trial court is mandated to employ the standard set forth in RCr 9.36.
*12 Sturgeon v. Commonwealth , 521 S.W.3d 189, 193 (Ky. 2017). RCr 9.36(1) states in pertinent part, that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." Further, the trial court should base its decision to excuse a prospective juror "on the totality of the circumstances, not on a response to any one question." Fugett v. Commonwealth , 250 S.W.3d 604, 613 (Ky. 2008). "[A] trial court's erroneous failure to excuse a juror for cause necessitating the use of a peremptory strike is reversible error." Little v. Commonwealth , 422 S.W.3d 238, 241 (Ky. 2013) (citing Shane v. Commonwealth , 243 S.W.3d 336 (Ky. 2007) ).
When questioned about media coverage, Juror 601 noted what she had heard about the case from press reports. Specifically, she recalled reading that Hilton failed to obey a stop sign and that he had been drinking or under the influence of drugs the night of the collision. Juror 601 went on to explain that she did not know how to feel about what she had read and expressed doubts about whether what she had read and heard was accurate. Additionally, she stated that she would be able to decide the case based solely on the evidence presented at trial.
Hilton questioned Juror 601 about two unrelated topics[10] -knowledge of the Taylor family and Hilton's right not to testify. Juror 601 explained that her son was friends with Taylor's parents, but that they were not close. Further, she explained that her son had likely spoken with her a little about the case. Additionally, Hilton questioned Juror 601 about his right not to testify. Hilton repeatedly rephrased his questions, which were inartfully phrased to say the least. Juror 601, understandably, did not know how to respond.[11] Ultimately, Juror 601 noted that if the Commonwealth proved its case beyond a reasonable doubt she would probably need to hear something at trial from Hilton.
*13 Afterwards the trial court explained to Juror 601 that Hilton had a constitutional right not to testify and that if he elected not to testify that decision could not be used against him. With this explanation from the court, Juror 601 answered that she would have no problem following an instruction that set forth that right.
Hilton moved to strike Juror 601 for cause based on her knowledge of the case and her son's interactions with Taylor's parents. The trial court denied the motion and admonished Hilton for questioning Juror 601 about whether she would expect Hilton to testify given that it was outside of the scope for which they were questioning the potential jurors at that particular time and due to the fact that the court had not yet given information to the jury about Hilton's right not to testify. Later, during voir dire Juror 601 offered two additional observations: 1) that she was aware that there had been a song about Taylor posted on Facebook, but that she had not listened to it; and 2) that she saw on Facebook that Taylor's father had recently served as a commencement speaker at a local high school.
The trial court did not abuse its discretion in denying Hilton's motion to strike Juror 601 for cause. Juror 601's knowledge of the June 22, 2014 collision was minimal and she understood that she was to rely only on the evidence presented at trial to decide Hilton's guilt or innocence. Additionally, while Juror 601's son had a tenuous friendship with Taylor's parents, that was no basis for deeming Juror 601 disqualified. See Derossett v. Commonwealth , 867 S.W.2d 195, 197 (Ky. 1993) ("Acquaintance with a victim's family or residing in the same general neighborhood is not a relationship sufficient to always disqualify a prospective juror.") (citations omitted). Moreover, we are convinced that Juror 601's statement about wanting Hilton to testify was insufficient to warrant removal when considered in the context of the questions asked. Here, Juror 601 did not have the benefit of the trial court's guidance on the law concerning Hilton's right not to testify before being questioned about that topic. However, once she was informed of the law, she expressed no reservation in being willing to follow the trial court's instructions. As such, we are unable to conclude that the trial court abused its discretion or was clearly erroneous when it declined to excuse Juror 601.
When individually questioned about her knowledge of the case from media coverage, Juror 99 explained that she had heard of a fatality due to an alleged drunk driver. This information was not obtained directly from the media, but rather from Juror 99's daughter who was friends and went to school with some of Taylor's cousins. Juror 99 explained that she was not sure that what she had heard from her daughter was accurate nor would she be influenced by what she had heard. Juror 99 also acknowledged that she had learned about Brice Taylor's death from her daughter. Further, she noted that her daughter had been shocked by the sudden death of these two youths.
Hilton requested the trial court strike Juror 99 for cause based on her daughter's relationship with Taylor's cousins and her knowledge of Brice Taylor's death, a fact the parties had agreed to not discuss during the guilt phase of Hilton's trial due to its irrelevance. In denying the motion, the trial court noted that Juror 99 had limited information about the case and that her words and demeanor demonstrated that she would not be influenced by this knowledge. Later in the voir dire , Hilton renewed his motion to strike Juror 99 after she expressed knowledge of the so-called "Brianna Taylor law." The trial court denied the motion finding that Juror 99's *14 knowledge was limited to knowing that the legislation concerned driving under the influence, but did not know how it related to this case.
The trial court did not abuse its discretion in denying Hilton's motion to strike Juror 99 for cause. Similar to his argument to strike Juror 601, Hilton sought to remove Juror 99 based on her child's relationship with a member of the victim's family. That a family member of a potential juror might have interacted with someone close to the victim of a crime in and of itself is insufficient to warrant the juror's removal. It is obvious that Juror 99's knowledge of Hilton's crimes and related events was limited and her responses clearly indicated a willingness to put that knowledge aside to decide Hilton's case on the evidence presented at trial. See Furnish v. Commonwealth , 95 S.W.3d 34, 45 (Ky. 2002) ("The fact that a prospective juror may have some knowledge of a case does not establish objective bias.") (quoting Foley v. Commonwealth , 953 S.W.2d 924, 932 (Ky. 1997) ). Accordingly, the trial court did not err in denying Hilton's motion to excuse Juror 99 from service.
When asked what she had learned about Hilton's crimes from the media, Juror 21 explained that she had heard that there was a vehicle collision allegedly involving a drunk driver, in which one person was killed and another injured. Additionally, Juror 21 heard that the deceased's brother had been in an accident shortly thereafter. When asked for her feelings about what she had heard, Juror 21 explained that it made her "sad as far as what's happened to the family, to everyone involved." Later she also opined that she was angry that the collision had occurred. She noted that the anger did not arise from the allegations of drunk driving, but rather from the loss itself. Juror 21 explained that it bothered her that people were hurt in this incident, as it does when an injury or death occurs under any circumstance.
After questioning from the trial court, Juror 21 acknowledged that media accounts were not always accurate and that she would rely solely on the information presented in court to determine Hilton's guilt or innocence. Additionally, Juror 21 stated that she had no opinion of Hilton and that she felt that she could be objective. Subsequently, Hilton sought to remove Juror 21 for cause based on her emotional responses about the collision. The trial court denied the request, finding Juror 21 to be objective and, based on her responses, able to make her decision based on the evidence. As for Juror 21's emotional responses, the trial court noted that was a natural reaction to people being hurt.
Clearly, the trial court did not abuse its discretion in denying Hilton's motion to strike Juror 21 for cause. Juror 21's knowledge of the case was minimal and it was clear that she was prepared to set aside that information and rely only on the evidence presented at trial. As to Juror 21's emotional responses, it is not as Hilton suggests that she had a "state of mind that precluded her from being impartial." Instead, her responses clearly indicate that she attributed no blame to Hilton for the collision, rather a general feeling of sadness and anger at the loss of life. Juror 21's remarks simply reflected a natural reaction and timeless concern for loss in an interconnected world.[12] Accordingly, we find that the trial court did not abuse its *15 discretion when it declined to excuse Juror 21.
When individually questioned about her pre-existing knowledge of the case, Juror 229 stated that she had watched some television coverage, but that she did not remember specific facts about the case. Further, she agreed that media accounts of events were not always accurate and that she would base her decision as a juror on the evidence presented in court. Also, while she had lived in the area where the collision occurred, she did not know the Taylor family personally. Juror 229 noted that she was aware of fundraisers that had been held for the Taylor family. Also, Juror 229 stated that the victims' families had engaged in some community outreach efforts. Specifically, she had heard from acquaintances of her daughter that the Taylor and Harig families were speaking to high school students about the dangers of drinking and driving.
Hilton requested that Juror 229 be struck for cause due to her knowledge of the Taylors' community outreach efforts. The trial court denied the motion, finding that the juror was not influenced by the limited knowledge that she had and that she could set that information aside in evaluating Hilton's case. Further, the trial court noted that while Juror 229 was aware of the Taylor family's efforts in the community, she did not attach any particular significance to that activity. It is clear that the trial court did not abuse its discretion in denying Hilton's motion to remove Juror 229 for cause. Juror 229's knowledge of the case was limited and her responses demonstrated a willingness to set aside that information and decide the case based on the evidence presented at trial. As she was clearly not influenced by her preexisting knowledge, we agree that the trial court acted properly in denying Hilton's motion to remove her for cause.
V. The Trial Court Did Not Abuse Its Discretion in Denying Hilton's Request for a Mistrial.
Hilton contends that the trial court erred by failing to declare a mistrial after the jury learned he had sent letters to Taylor's family while incarcerated pending trial. During the penalty phase of Hilton's trial, David Taylor, the father of Brianna Taylor, was asked if his family had received a letter from Hilton; Taylor responded, "[yes], it came from Nelson County Jail." Despite the prosecutor telling Taylor to "[h]old on a second," Taylor repeated to the jury that "[the letter] came from Nelson County Jail."
Hilton objected and requested a mistrial. Hilton argued that Taylor's statement introduced "inappropriate and irrelevant information." Further, Hilton reminded the trial court that pretrial he had filed a motion for witnesses to testify in accordance with the rules of evidence and that Taylor's testimony was "exactly the kind of thing I was afraid of at that time." The Commonwealth responded by noting that its witnesses had been instructed not to mention Hilton's incarceration. Also, the Commonwealth argued that the jury had not heard Taylor's statement due to its interjections during Taylor's testimony.
Subsequently, the trial court explained that it had heard Taylor's reference to the Nelson County Jail twice and that the question was what remedy should be used to address this situation. The trial court concluded that a mistrial was not warranted under the circumstances. However, the trial court did offer Hilton an admonition, in which he would order the jury to disregard Taylor's statement. Hilton expressed reservations about the use of an admonition, worrying that it would draw more attention to the statement. Ultimately, while Hilton declined the trial *16 court's offer of an admonition, the trial court decided sua sponte to admonish the jury. The trial court stated that "[w]here the letter came from is not germane. You should not give any credibility to that, it's not important in this case as to where the letter came from. So you are to disregard that." We review the trial court's refusal to grant a mistrial under an abuse of discretion standard. Shabazz v. Commonwealth , 153 S.W.3d 806, 811 (Ky. 2005).[13]
A mistrial is "an extreme remedy to be resorted to only when a fundamental defect in the proceedings has rendered a fair trial manifestly impossible." Bartley v. Commonwealth , 400 S.W.3d 714, 735 (Ky. 2013) (citing Parker v. Commonwealth , 291 S.W.3d 647 (Ky. 2009) ). "When an admonitory cure is possible, a mistrial is not required." Doneghy v. Commonwealth , 410 S.W.3d 95, 107 (Ky. 2013)(quoting Shepherd v. Commonwealth , 251 S.W.3d 309, 318 (Ky. 2008) ). Further, the "jury is presumed to follow the trial court's admonition." Id. (quoting Burton v. Commonwealth, 300 S.W.3d 126, 143 (Ky. 2009) ).
There are only two situations in which the trial court's admonition will not be presumed to cure a reference to inadmissible evidence:
(1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition and there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant, ... or (2) when the question was asked without a factual basis and was "inflammatory" or "highly prejudicial."
Bartley , 400 S.W.3d at 735 (quoting Johnson v. Commonwealth , 105 S.W.3d 430 (Ky. 2003) (emphasis and ellipse in original).
Hilton's argument focuses little attention on the trial court's use of an admonition in this case, other than to claim it "exasperated (sic) the harm," by bringing undue attention to Taylor's testimony. Instead Hilton's argument is replete with citations to cases throughout the country about the deleterious effect to the presumption of innocence where a defendant is bound, handcuffed, or compelled to go to trial in a prison garb. These cases are largely irrelevant to the issue before us.
In the case at bar, the trial court's use of an admonition is presumed to cure Taylor's erroneous reference to inadmissible evidence. Indeed, admonitions have been successfully used both in this Commonwealth and in federal court to address improper testimony about a defendant's prior incarceration. See United States v. Aichele , 941 F.2d 761, 765 (9th Cir. 1991) (reversal was not warranted for improper testimony about the defendant's prior incarceration due to trial court's admonition and the strength of the government's case against the defendant); Matthews v. Commonwealth , 163 S.W.3d 11, 17 (Ky. 2005) (trial court did not abuse its discretion where it "refus[ed] to grant a mistrial on the grounds that evidence of [incarceration for] a prior crime was introduced through the non-responsive answer of a witness for the prosecution.").[14]
*17 Further, our review demonstrates that the exceptions to the use of an admonition do not apply here. As the Commonwealth's question of Taylor was asked with a factual basis-whether his family had received a letter from Hilton-the second exception does not apply. Nor can we say that the first exception applies as there is no evidence that the jury was unable to follow the court's admonition or that Taylor's statement was "devastating" to Hilton. As noted, the statement occurred in the penalty phase after the jury had found Hilton guilty, lessening its impact. Accordingly, we conclude that the trial court's admonition to the jury was sufficient to cure Taylor's impermissible reference to Hilton's pretrial incarceration.
VI. It Was Harmless Error for the Trial Court to Permit Testimony About What Would Constitute an Appropriate Sentence for Hilton.
Hilton contends that it was error for the trial court to permit the Commonwealth to inquire of a victim and victims' families during the penalty phase what sentence they would like him to receive.[15] Hilton argues that the admission of victim impact evidence is limited to the specific harm caused by the crime and that a victim or a victim's family is not permitted to opine as to what would be an appropriate sentence.
During the penalty phase the Commonwealth questioned Mickayala Hang's mother, Donna McNutt, about how the accident affected her daughter. During McNutt's testimony, the Commonwealth asked, "How long would you like to see the defendant in custody?" Over Hilton's objection, McNutt stated that she would like to see him receive the maximum sentence. A similar sentiment was later expressed by Mickayala Harig and Briana Taylor's parents.
KRS 532.055(2)(a)(7) permits the Commonwealth to present during the penalty phase of the trial "[t]he impact of the crime upon the victim or victims, as defined in KRS 421.500, including a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim or victims[.]" We review the trial court's decision to admit evidence under an abuse of discretion standard. Clark v. Commonwealth, 223 S.W.3d 90, 95 (Ky. 2007) (citing Brewer v. Commonwealth , 206 S.W.3d 313, 320 (Ky. 2006) ).
In support of his argument that it was improper for the victim and victims' families to suggest what would constitute an appropriate sentence, Hilton relies upon Bosse v. Oklahoma , 580 U.S. ----, 137 S.Ct. 1, 196 L.Ed.2d 1 (2016) (per curiam ). After a jury trial, Bosse was convicted of three counts of first-degree murder. Id. at 2. During the penalty phase of his trial, the prosecution was permitted to ask the victims' relatives to recommend a sentence to the jury. Id. The victims' relatives recommended death and the jury returned that verdict. Id. After Bosse's sentence was affirmed by the Oklahoma Court of Criminal Appeals, the U.S. Supreme Court accepted certiorari. Id.
In vacating the decision of the state appellate court, the Bosse Court briefly sketched the recent history of victim impact evidence. In *18 Booth v. Maryland , 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Supreme Court held that "the Eighth Amendment prohibits a capital sentencing jury from considering victim impact evidence," unrelated to the direct circumstances of the crime. Id. at 501-02, 507, 107 S.Ct. 2529, n.10. Yet, shortly thereafter the Supreme Court reconsidered its position in Payne v. Tennessee , 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The Payne Court determined that "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." Id. at 825, 111 S.Ct. 2597. Accordingly, the Payne Court held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." Id. at 827, 111 S.Ct. 2597. Notably, the Payne Court did not address the portion of Booth which held "that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." Id. at 830, n.2, 111 S.Ct. 2597. However, the Oklahoma Court of Criminal Appeals concluded that Payne implicitly overruled this portion of Booth . Bosse , 137 S.Ct. at 2.
Admonishing the state appellate court, the Bosse Court reiterated that it is the sole prerogative of the Supreme Court to overrule one of its precedents. Id. (citing United States v. Hatter , 532 U.S. 557, 567, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001) ). Further, the Bosse Court reiterated that lower courts "remain[ ] bound by Booth's prohibition on characterizations and opinions from a victim's family members about the crime, the defendant, and the appropriate sentence unless this Court reconsiders that ban." Id.
While it is clear that opinions from the victim's family on what constitutes an appropriate sentence are forbidden in a capital case, the Supreme Court has not addressed whether these opinions are also barred in a non-capital sentencing proceeding. Indeed, the Booth Court acknowledged that its
disapproval of victim impact statements at the sentencing phase of a capital case does not mean, however, that this type of information will never be relevant in any context. Similar types of information may well be admissible because they relate directly to the circumstances of the crime. Facts about the victim and family also may be relevant in a non-capital criminal trial.
482 U.S. 496, 507 n.10, 107 S.Ct. 2529. Further, the Booth Court explained that its decision was "guided by the fact death is a 'punishment different from all other sanctions,' and that therefore the considerations that inform the sentencing decision may be different from those that might be relevant to other liability or punishment determinations." Id. at 509, n.12, 107 S.Ct. 2529 (quoting Woodson v. North Carolina , 428 U.S. 280, 303-304, 305, 96 S.Ct. 2978, 2990-2991, 49 L.Ed.2d 944 (1976) (plurality opinion) ). As such, the Booth Court "impl[ied] no opinion as to the use of these statements in noncapital cases." Id.
Whether to permit opinions from the victim or victim's family on what constitutes an appropriate sentence in a non-capital penalty phase is an issue of first impression for this Court.[16] After considering this issue, we conclude that the sentencing *19 recommendations made by the victim and victims' families in this case were improperly admitted. While KRS 532.055(2)(a)(7) permits testimony on the impact of the crime upon the victim, by including the "nature and extent of any physical, psychological, or financial harm suffered," expanding this discussion of victim impact to permitting the recommendation of a punishment for the defendant constitutes too broad a reading of the statute. Accordingly, we conclude that the trial court abused its discretion in admitting this evidence.
However, while the trial court erred in permitting the victim and the victims' families to recommend to the jury a punishment for Hilton, we fail to discern any substantial effect upon his sentence. "A non-constitutional evidentiary error is deemed harmless 'if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." Gaither v. Commonwealth, 521 S.W.3d 199, 205 (Ky. 2017) (quoting Winstead v. Commonwealth , 283 S.W.3d 678, 688-89 (Ky. 2009) ). In the case at bar, the jury learned of Hilton's serious criminal history which included multiple prior felony convictions and numerous misdemeanor convictions for driving while under the influence of alcohol. Based on Hilton's criminal history and the serious offenses he was convicted of in this case, we can say with fair assurance that the jury's verdict was not swayed by the testimony of Harig and the family members of the victims.
In closing, while the facts of Hilton's case lead us to conclude that the admission of this evidence was error, but not reversible, under different circumstances, reversal could well be the appropriate remedy. Simply put, prosecutors should avoid this type of evidence.
CONCLUSION
For the foregoing reasons, we affirm the conviction and sentence of the Hardin Circuit Court.
All sitting. All concur.

For clarity we will refer to Kyle Hilton as Kyle and Michael Hilton as Hilton.

Hilton contends that the trial court's refusal to grant his motion for change of venue violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections Two, Three, Seven, and Eleven of the Kentucky Constitution.

The Commonwealth contends that Hilton waived appellate review of the trial court's denial of his motion for change of venue by failing to renew his motion after voir dire. However, our review of the record demonstrates that Hilton renewed his motion at the close of voir dire and as such this issue is properly before the Court for adjudication. Cf. Johnson v. Commonwealth , 892 S.W.2d 558, 562 (Ky. 1994) ("The appellant did not renew his motion for a change of venue at any time during this process and accordingly he waived any objection as to venue.").

Brice Taylor died in an automobile accident shortly after leaving a memorial service for his sister.

This daily newspaper, which had the most extensive coverage relevant to the case, had a circulation of only 12,000, less than fifteen percent of the county's population.

Hilton contends that the trial court's refusal to grant his motion to exclude Hall's testimony violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution.

Hilton contends that the trial court's refusal to grant his motions for a continuance violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution and Sections Two and Eleven of the Kentucky Constitution.

Based on the wording of the trial court's order granting a continuance, it appears that the Commonwealth either joined Hilton's motion or made a separate request for a continuance.

Hilton contends that the trial court's refusal to strike these jurors violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Sections Two, Seven, and Eleven of the Kentucky Constitution.

At that juncture, the voir dire was focused solely on pretrial publicity.

Defense-What if you only knew what you had read in the paper or heard on the news and what the prosecutor presents as evidence in this case, but nothing else, do you have an opinion about the case based on that or maybe Mr. Hilton's guilt based on that?
Juror-No, could you repeat that?
Defense-Sure, I apologize.
Juror-That's okay.
Defense-Based on what you know that you've heard Or read in the paper and evidence that [the prosecutor] would present if it supports what you've heard would you have an opinion about his guilt at that point?
Juror-If he proves it?
Defense-If he presents evidence supporting what you heard in the paper but you didn't hear anything else?
Juror-I'm confused ... don't understand.
[Crosstalk between juror, defense, and trial court. Trial court advises juror that anytime she does not understand a question, she should ask for it to be restated.]
Defense-Here's what I'm asking, the prosecutor has to prove his case beyond a reasonable doubt what if that's all you heard and you didn't hear any other evidence from me the defense attorney? Based on that based about what you know about the ease would you have an opinion about his guilt?
Juror-Probably
Defense-What would that be?
Juror-I would say guilty.
Defense-So you would need to hear something (juror interjects yes) from the defense. Would you need to hear Mr. Hilton testify on his behalf?
Juror-Probably
Defense-If he didn't testify would you then be more likely to find him guilty? '
Juror-No probably not.
Defense-Probably not more likely to find guilty.
Juror-Probably not.
Defense-What if he didn't testify?
Juror-I think he should testify
Defense-You think he should.

See John Donne, Meditation No. XVII, Devotions Upon Emergent Occasions (1623) ("[n]o man is an island, entire of itself ... any man's death diminishes me, because I am involved in mankind[.]").

Hilton erroneously contends that evidence of Hilton's incarceration should not have been admitted and therefore the Court should determine whether the trial court abused its discretion in permitting the admission of this evidence. Notably, the trial court did not permit the admission of evidence of Hilton's incarceration, but rather expressly admonished the jury to disregard that testimony. Accordingly, the Court is not reviewing the admission of this evidence, but whether the trial court's denial of Hilton's motion for a mistrial was an abuse of its discretion.

Notably, Matthews involved testimony during the guilt phase, while here the jury heard the jail reference in the penalty phase, after having already convicted Hilton.

Hilton contends that the trial court's admission of this testimony violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections One, Two, Three, Eleven, Seventeen, and Twenty-Six of the Kentucky Constitution.

Hilton cites this Court to Elery v. Commonwealth , 368 S.W.3d 78 (Ky. 2012), in which the Court noted in dicta that a witness whose testimony was not deemed to be palpable error did not "allude to the pending penalty decision that the jury would soon be called to make, much less provide a recommendation."