RENDERED: APRIL 30, 2020
TO BE PUBLISHED
DATE 5-28-2020
Karen Call



## Supreme Court of Kentucky

### 2018-SC-000466-MR

DAWAN Q. MULAZIM  APPELLANT

V.  ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE PAMELA GOODWINE, JUDGE
NO. 15-CR-00592-003

COMMONWEALTH OF KENTUCKY  APPELLEE

AND

### 2018-SC-000471-MR

QUINCINIO DEONTE CANADA  APPELLANT

V.  ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE PAMELA GOODWINE, JUDGE
NO. 15-CR-00592-001

COMMONWEALTH OF KENTUCKY  APPELLEE

**OPINION OF THE COURT BY JUSTICE HUGHES**

**AFFIRMING**

A Fayette County jury found Appellants, Dawan Q. Mulazim and Quincinio Deonte Canada, guilty of several counts of first-degree robbery, tampering with physical evidence and of being first-degree Persistent Felony Offenders (PFOs). The trial court sentenced Mulazim to sixty years in prison

and Canada to fifty years in prison in accordance with the jury's recommendation. Appellants raise identical issues concerning jury selection, admissibility of evidence, burden shifting, and shackling. After careful review, we affirm the trial court.

## RELEVANT FACTS

On June 15, 2014, Shane Hansford and Mitchell Smith travelled to Lexington, Kentucky, to help set up a booth for a gun show. The two had a room at the Quality Inn near New Circle Road. Hansford's girlfriend, Jessica Rutherford,[1] met them for dinner later that evening, and afterwards the three stopped by a liquor store before returning to the Quality Inn.

Sometime around 3:00 a.m., Rutherford stepped outside the hotel room to make a phone call, and Hansford followed her outside to smoke. Hansford left the door to the room partially open and joined Rutherford in an area that was well lit by surrounding lights from the pool and parking lot. While the couple were outside, two men appeared from around the corner and approached them. The men pointed their weapons at Hansford and Rutherford, demanded everything they had and forced them into their hotel room. Smith heard the commotion and retrieved Hansford's handgun, a .45 caliber Springfield XDS, from the nightstand as he prepared to confront the intruders. One of the men saw the gun and took it from Smith.

---

[1] Subsequent to the crimes committed in this case, Jessica Rutherford married Shane Hansford. The parties in this case referred to her as "Jessica Hansford," but to avoid confusion we refer to her by her maiden name.

The man later identified as Mulazim instructed the three victims to lie face down on the beds while his accomplice, Canada, searched the drawers, Hansford's backpack, and under a mattress. At trial, Hansford testified that prior to leaving the hotel room one of the men looked at the other and said, "come on nephew." When asked which man made that statement, Hansford pointed at Mulazim. He also identified Mulazim as the man that held him at gunpoint, stating there was no doubt in his mind. Prior to trial Hansford identified Mulazim as one of the robbers from a photo lineup. Rutherford could not identify either of the robbers pre-trial, and Smith could not identify Mulazim but made an equivocal identification of Canada, choosing him and another person from the photo lineup.

The men stole Hansford's and Smith's wallets, a phone, the handgun, and a can of tobacco. Both Hansford and Rutherford called 911 separately to report the robbery. Meanwhile, Smith retrieved another handgun that was stored in their hotel room and pursued Mulazim and Canada but could not catch them. Police responded to the hotel where all three victims were visibly shaken. The victims provided descriptions of the suspects that included clothing type and color, hairstyle, and descriptions of the guns they used. The police later met with the victims to obtain spent casings from the stolen handgun and to present photo lineups.

At trial, the Commonwealth presented the testimony of a police detective who obtained Mulazim's and Canada's cell phone records and forensically examined Mulazim's phone. The phones contained text messages in which

Mulazim referred to Canada as "nephew" and Canada referred to Mulazim as "unc." The police investigation also revealed that Canada's phone communicated through a cell tower approximately 1700 feet from the Quality Inn minutes before the 911 calls regarding the robbery.

On June 20, 2014, five days after the Quality Inn robbery, Megan Price was celebrating her birthday with her husband, Jonathan Price. The couple and a group of their friends met at Austin City Saloon in Lexington. Megan and Jonathan went outside a little after midnight to wait for their ride and two men approached them. Megan described one of the men as having dreadlocks and the other man as being shorter with short hair and a dark shirt. One of the men held a gun to Jonathan's head and told him to hand over his money, while the other man tugged at Megan's purse as she tried to hand it over. Megan heard a gunshot and fell, realizing she was shot in the leg. As Megan handed the man with dreadlocks her purse, Jonathan punched the other robber and told Megan to run. Jonathan was also shot, and the man with dreadlocks took his wallet as he fell to the ground. Megan required surgery for her gunshot wound and survived, but Jonathan died from his injuries. A surveillance camera from an adjacent business captured the incident, although the quality of the video played at trial was poor. Megan provided a description of the robbers to the police.

Detective Tim Upchurch was assigned to investigate the Quality Inn robbery and he entered the serial number of Hansford's stolen Springfield .45 XDS handgun into a national database for stolen weapons. The Bureau of

Alcohol, Tobacco and Firearms later recovered Hansford's stolen handgun during a controlled street transaction with a man named Anthony Frye approximately two and a half months after Jonathan Price's murder. Detective Upchurch learned that police believed the same kind of gun stolen at the Quality Inn may have been used in the Austin City Saloon shooting based on the shell casings from the murder scene. Those casings were later compared with casings fired from the recovered handgun. Based on information received, Mulazim and Canada were developed as suspects for the crimes at both the Quality Inn and the Austin City Saloon.

Mulazim and Canada were both charged with the aggravated murder of Jonathan Price, the second-degree assault of Megan Price, and five counts of first-degree robbery, three at the Quality Inn and two at the Austin City Saloon. Mulazim was also charged with tampering with physical evidence. Canada was acquitted of all charges related to the events at Austin City Saloon, but the jury found him guilty of three counts of first-degree robbery at the Quality Inn and of being a first-degree PFO. He received a sentence of fifty years on each count to run concurrently. The jury convicted Mulazim of the three robbery charges related to the Quality Inn incident, tampering with physical evidence, and of being a first-degree PFO. He received a sixty-year sentence. The jury could not reach a decision about Mulazim's guilt on any of the charges related to the Austin City Saloon incident. Both Defendants now appeal their convictions as a matter of right.

## ANALYSIS

### I. The trial court properly admitted Smith's pre-trial photo identification of Canada.

Prior to trial, Mulazim and Canada filed separate but similar motions to suppress the pre-trial identifications Hansford and Smith made to police, arguing that the photo identification procedures were unduly suggestive and unreliable. In this appeal, Appellants only raise arguments as to Smith's pre-trial identification of Canada.

Canada argues that the trial court erred by failing to suppress the identification because the photo lineup used an intentionally altered photograph. Specifically, Canada has a small tattoo on his face under his left eye, but the photo of Canada used in the lineup does not show the tattoo.

The trial court conducted an evidentiary hearing on the motion to suppress at which Officer Dunn testified as to how she assembled the photo lineup. She explained that she searched the Fayette County Detention Center website for photos of similar age subjects who had hair, eye color and skin tone comparable to Canada. She testified that Lexington Police guidelines at that time suggested that if a suspect had visible scars or tattoos present then that area of the suspect's face should be obscured in the photo and all subjects in the photo lineup should have the same parts of their faces covered as well. Officer Dunn testified that because another officer gave her the photo of Canada she was unaware at the time she used it that it had been altered.

The trial court denied the motion to suppress, stating the ruling might have been different if the three Quality Inn witnesses identified Canada's photo

with absolute certainty. However, Hansford and Rutherford did not identify Canada, and Smith actually selected two photos out of the six photos in the lineup — one of Canada and one of a man incarcerated at the time of the crimes. He wrote "Number 2 & 5 look most like the man with the dreads that robbed me at gunpoint. If I saw them in person I could make a distinction from there and saw (sic) how tall they were." The trial court found that the photo lineup was not unduly suggestive and admitted Smith's pre-trial identification.

At trial, Smith testified that he identified two individuals in the photo lineup that looked like the man with dreadlocks that robbed him at gunpoint and further stated that he had told the police he would be better able to distinguish the men if he could see how tall they were. At that point, the Commonwealth directed Smith's attention to Canada, sitting in the courtroom, and Smith confirmed that he was the one who robbed him.

Canada fully cross-examined Smith about his in-court identification and his failure to identify Canada in the photo lineup prior to trial. Smith admitted that he did not say anything to the police about either of the robbers having a facial tattoo. Canada also introduced an expert who testified about the difficulty of cross-racial eyewitness identifications, and who cast doubt on the reliability of in-court identifications.

Determining whether identification testimony violates a defendant's due process rights requires a two-step process:

> First, the court determines if the identification procedures were impermissibly suggestive. If they were not, then the admission of

evidence based thereon does not violate the Due Process Clause, and the inquiry is at an end. If the procedures were unduly suggestive, then the court moves to the second step of the test and determines whether, in light of the totality of the circumstances, the suggestive procedures created a very substantial likelihood of irreparable misidentification.

*Duncan v. Commonwealth*, 322 S.W.3d 81, 95 (Ky. 2010). "The 'clearly erroneous' standard applies to a trial judge's findings of fact on a motion to suppress evidence." *King v. Commonwealth*, 142 S.W.3d 645, 649 (Ky. 2004) (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). "A trial judge's ruling as to the admissibility of evidence is reviewed under an abuse of discretion standard." *Id.* The trial court abuses its discretion when its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

We begin by considering whether the identification was unduly or impermissibly suggestive. *Duncan*, 322 S.W.3d at 95. Canada argues that because Smith did not describe the perpetrator as having a facial tattoo that the police intentionally altered Canada's photo to conform to Smith's memory of the events — *i.e.*, that he was robbed by a man without a facial tattoo. He insists that because the photo Smith identified (actually one of the two he singled out) was not a true representation of Canada's appearance, the trial court erred in admitting the identification. We disagree.

This issue is a novel one, with few cases from around the country addressing law enforcement officials digitally editing (photoshopping) identifying marks to remove them from a suspect's lineup photo. Much of the

applicable case law focuses on lineups in which the "filler" photos are dissimilar to the defendant or descriptions of the suspect, thereby causing the defendant's photo to stand out to the witness making the identification. That is not a concern in this case because the individuals in Canada's lineup were substantially similar in appearance. The sole issue here is the alteration of Canada's photo to remove his facial tattoo.

In *United States v. Allen*, 416 F. Supp. 3d 1108 (D. Or. 2019), Allen robbed or attempted to rob four different banks. Several bank tellers served as witnesses, identifying the perpetrator with sufficient information to lead the police to suspect Allen. *Id.* at 1110-11. One witness remembered seeing faint tattoos on the robber's face, stating it appeared that the robber wore makeup. *Id.* at 1111. Allen has several tattoos on his face and in creating a lineup police photoshopped the tattoos out of the photo presented to the bank tellers. *Id.* The lineup included Allen's photo, along with photos of other individuals with similar features. *Id.* Three of the four bank tellers identified Allen as the perpetrator. *Id.* at 1112.

Allen moved to suppress the photo identifications because police modified his photo to remove his facial tattoos. *Id.* The U.S. District Court for the District of Oregon held that the procedure used by law enforcement was not unnecessarily suggestive under *Neil v. Biggers*. *Id.* at 1114. The court noted that no binding precedent conclusively resolved the case, but based its determination on the following: (1) the method of editing was neutral because the technician matched the color used to cover the tattoos with the same color

as the skin surrounding the tattooed area; (2) one teller described faint tattoos, stating it appeared they had been covered; (3) the lineup was conducted double-blind to prevent bias; and (4) three of the four tellers identified Allen as the robber with a reasonably high degree of certainty. *Id.* The District Court also noted that the reliability of the identifications is an issue for the jury to resolve. *Id.* Finally, the District Court in *Allen* noted:

> This Court shares Defendant's concerns about the police conduct at issue in this case. It remains unclear to this Court where the line between constitutional and unconstitutional police conduct lies with regard to editing the photograph of a defendant in a lineup. But wherever that line is, it was not crossed here.

*Id.* at 1114.

Digital alteration of photos used in eyewitness identification lineups is a relatively new practice and there is little guidance as to what constitutes a permissible alteration. While facial tattoos are uncommon, many individuals may have other identifying marks on their faces, such as scars, birthmarks, or piercings. These types of features can make it increasingly difficult for law enforcement officers to find similar filler photos when preparing photo lineups. However, a defendant need not be surrounded by individuals nearly identical to him to render a pre-trial lineup and identification admissible. The ultimate concern is whether the manipulation of the defendant's photo resulted in an impermissibly suggestive identification procedure. Here, we can say with assurance that the procedure was not impermissibly or unduly suggestive.

Under the specific circumstances in this case, the identification procedures were not unduly suggestive because, as the trial court emphasized,

Smith was unable to definitively identify Canada's photo as that of the man who robbed him. Smith merely reduced the field of photos from six to two. "The key to the first step is determining whether Appellant stood out of the lineup so much that the procedure was unduly suggestive." *Oakes v. Commonwealth*, 320 S.W.3d 50, 57 (Ky. 2010). Canada's photo does not stand out of the photo lineup. The fact that the other two victims, Hansford and Rutherford, were not able to identify Canada in the photo lineup, further establishes that it was not unduly suggestive.

As the trial court noted, the lineup would have most likely been challenged as impermissibly suggestive if police had left the tattoo on Canada's face because he undoubtedly would have stood out in the lineup. Would that have been the better alternative nonetheless? We need not decide that hypothetical but note as the federal district court did in *Allen* that there is a line between constitutional and unconstitutional conduct "with regard to editing the photograph of a defendant in a lineup." 416 F. Supp. 3d at 1114. That line was not crossed here where the small tattoo was photoshopped so that Canada's face appeared as it would have without the tattoo. Further, we note that participants in lineups inevitably will have differing facial characteristics. It will be difficult, and perhaps impossible, for law enforcement officers to obtain photographs of virtually identical individuals, especially considering the various forms of distinguishing marks, features, and tattoos a person may have. In the end, issues such as this will have to be judged on a case-by-case basis.

Canada argues that when police removed the tattoo from the photo they ensured they were making Smith's identification less reliable and the photo impermissibly suggestive because it catered to either a) Smith's correct recollection of being robbed by a man without a facial tattoo or b) Smith's incorrect recollection of being robbed by Canada, a man who did have a facial tattoo. As the Commonwealth contends, this argument conflates the weight and admissibility of an out-of-court identification. At trial Canada unquestionably was able to address the weight that the jury should give the identification both by cross-examining Smith and by offering expert testimony regarding cross-racial eyewitness identifications. Additionally, Canada had the opportunity to engage in a thorough cross-examination of the police officers as to how his photo was handled and how the lineup was assembled. The digital alteration of the photo was not problematic. In sum, the trial court did not err in finding the photo lineup was not impermissibly suggestive and therefore did not abuse its discretion in admitting the pre-trial identification.

## II. The evidence of first-degree robbery was sufficient to overcome the motion for directed verdict.

At the close of the Commonwealth's case, Mulazim and Canada moved for a directed verdict of acquittal as to the first-degree robbery charges arising from the Quality Inn incident. They argued that no forensic evidence linked them to those crimes and that none of the stolen items were recovered. Further, they posited that the only probative evidence linking them to the Quality Inn robberies were the photo identifications, which they argue were equivocal at best.

A trial court's ruling on a motion for directed verdict is reviewed under the following parameters:

> When presented with a motion for a directed verdict, a court must consider the evidence as a whole, presume the Commonwealth's proof is true, draw all reasonable inferences in favor of the Commonwealth, and leave questions of weight and credibility to the jury. The trial court is authorized to grant a directed verdict if the Commonwealth has produced no more than a mere scintilla of evidence; if the evidence is more than a scintilla and it would be reasonable for the jury to return a verdict of guilty based on it, then the motion should be denied. *Id.* On appellate review, the standard is slightly more deferential; the trial court should be reversed only if it would be clearly unreasonable for a jury to find guilt.

*Acosta v. Commonwealth*, 391 S.W.3d 809, 816 (Ky. 2013) (citations omitted). We review a trial court's ruling on a motion for directed verdict for an abuse of discretion, with abuse occurring when the court's decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

As noted, Appellants argue the only evidence linking them to the Quality Inn robberies were the victims' identifications. Although that is not the only evidence, we begin with the identifications. Prior to trial, Hansford identified Mulazim in a six-pack photo lineup, writing "The longer I look at the photos, number five [(Mulazim)] is who I feel robbed me." Additionally, Smith made the previously-discussed equivocal identification of Canada, stating that two of the six men in the photo array looked like the man who robbed him and that if he could see how tall the men are he could be more certain. Despite any hesitancy in their pre-trial identifications, both victims made positive in-court identifications of Mulazim and Canada during trial. As this Court stated in

*King v. Commonwealth*, 472 S.W.3d 523, 526 (Ky. 2015), "[t]he testimony of a single witness is enough to support a conviction." Questions as to the credibility and weight given to testimony are reserved for the jury. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). The jury could properly weigh the facts presented in assessing the reliability of the identifications.

Moreover, other evidence supported a finding of guilt as to both Mulazim and Canada. The Commonwealth established that Canada is Mulazim's nephew, and the jury heard testimony that they referred to each other as "unc" and "nephew" in text messages. One of the Quality Inn victims testified that Mulazim said "come on nephew" before exiting the hotel room. In addition, Canada's cell phone pinged off a cell tower less than half a mile from the Quality Inn around the time of the robbery.[2] The standard for a directed verdict, requiring only evidence "sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty," applies "whether the evidence is direct or circumstantial." *Brewer v. Commonwealth*, 206 S.W.3d 313, 318 (Ky. 2006). This evidence, in conjunction with the pre-trial and in-trial identifications of Mulazim and Canada, was more than sufficient to meet our directed verdict standard.

---

[2] The police obtained warrants for historical cell-site data for Canada's phone. The data revealed that his phone communicated with the cell tower close to the Quality Inn at 3:08 a.m. The police were dispatched to the scene thirteen minutes later to respond to the robbery reported by Hansford and Rutherford.

In support of their argument that the evidence was insufficient, Mulazim and Canada cite *Commonwealth v. Christie*, 98 S.W.3d 485 (Ky. 2002), for the proposition that cross-racial identifications have diminished probative value. However, the Court in *Christie* primarily determined that a trial court erred in excluding expert testimony on the reliability of eyewitness identifications. *Id.* at 492. Here, the trial court permitted Appellants' expert to testify regarding memory and eyewitness identification. The expert proffered his opinion that identification of others from a different race was more difficult than those of the same race. The jury was free to accept or reject this testimony as they saw fit in assessing the identifications made by the victims in this case.

For directed verdict purposes, "the trial court must assume that the evidence for the Commonwealth is true . . . [.]" *Benham*, 816 S.W.2d at 187. On the evidence presented, it was not unreasonable for the jury to conclude that Mulazim and Canada committed the Quality Inn robbery and consequently the trial court did not err in denying the Appellants' motions for directed verdict.

### III. The Commonwealth's closing argument did not impermissibly shift the burden of proof.

During a lengthy closing argument, the Commonwealth made the following statements regarding the defense's ability to investigate by contacting the robbery victims:

> The defense gets all their information, contact information, it's clear, because they talked about their investigator going to talk to them. They can go talk to them and ask them, what'd they see, what they say. They can get all that information.

Defense counsel objected, arguing that the Commonwealth was shifting the burden of proof to the Defendants and that the victims had no obligation to cooperate with the defense investigation. Defense counsel requested an admonition to the jury that those witnesses were under no duty to cooperate and in fact chose not to cooperate with the defense. The trial court overruled the objection and declined to admonish the jury.

Appellants now argue that the trial court erred in denying the request for an admonition during closing argument. They maintain that the prosecutor's suggestion that Mulazim and Canada should have obtained more information from the witnesses prior to trial was impermissible burden shifting.

Kentucky Revised Statute (KRS) 500.070 states that "[t]he Commonwealth has the burden of proving every element of the case beyond a reasonable doubt . . . ." Further, "[a]s the presumption of innocence mandates that the burden of proof and production fall on the prosecution, any burden-shifting to a defendant in a criminal trial would be unjust." *Butcher v. Commonwealth,* 96 S.W.3d 3, 10 (Ky. 2002). In reviewing a claim of an improper closing argument, this Court must keep in mind "the wide latitude we allow parties during closing argument," *Dickerson v. Commonwealth,* 485 S.W.3d 310, 331 (Ky. 2016), and must consider the closing argument as a whole, *Miller v. Commonwealth,* 283 S.W.3d 690, 704 (Ky. 2009). Here we find no impermissible burden shifting.

The Commonwealth's closing argument lasted over an hour and forty-five minutes. After the above-quoted statement was made, the Commonwealth

continued its closing argument for another hour and a half. The Commonwealth "did not imply that the defendant bears the burden of proof to establish his innocence . . . . " *Ordway v. Commonwealth*, 391 S.W.3d 762, 796 (Ky. 2013). Rather, the Commonwealth's statements merely suggested, correctly, that the defense is permitted to seek information from victims and witnesses. The Commonwealth did not comment on whether the defense actually sought information from the people involved in this case, nor did it comment on whether the victims and witnesses provided any information to the defense.[3] Clearly, the prosecutor did not state that defense investigators have the burden (or obligation) to talk to the victims and failed to do so here. The comments focused on by Appellants merely touched briefly on the defense's own ability to investigate, an important point given the defense's criticism of both the police investigation and the witnesses' allegedly changing memories regarding the robbers.

In *Ordway*, the defendant also argued that the Commonwealth impermissibly shifted the burden of proof, in that case by highlighting a defendant's ability to have evidence tested. 391 S.W.3d at 796. The Commonwealth made the following statements in its closing argument:

> [The defense] said Carlos Ordway would like to know what's on some of these things [e.g., the recorder]. Well if Carlos Ordway and his defense team wanted to know what was on some of these things, why didn't they, on June 4th, send them off? They could, too. They could too . . . . You see the defense has just as much access to the Kentucky State Police crime laboratory as the

---

[3] In fact, a defense investigator testified that he spoke with Smith and Rutherford about the robbery.

> prosecution. They can ask anything they want to be examined by the Kentucky State Police. It's a little disingenuous to say that we hid things from them.

*Id.* This Court held that the argument was proper because in fact the defense is entitled to inspect and test evidence. *Id.* Here, the Commonwealth's closing argument is similarly acceptable because the defense is permitted to question victims, even though the victims may choose not to cooperate. In any event, the Commonwealth's closing argument comments did not imply that the defense had to talk to the victims or had some obligation that they failed to meet. Analogous to *Ordway*, these isolated comments regarding access to witnesses simply do not rise to the level of burden shifting.

## IV. The trial court did not err in refusing to strike jurors for cause.

Mulazim and Canada next argue that the trial court erred in declining to strike five jurors for cause,[4] resulting in the Defendants being forced to use their peremptory challenges on those five individuals and thus depriving them of substantive rights pursuant to *Shane v. Commonwealth*, 243 S.W.3d 336 (Ky. 2007). In response, the Commonwealth notes that because the Defendants were given extra peremptory strikes, *i.e.*, more than required by Kentucky Rule of Criminal Procedure (RCr) 9.40, no error occurred pursuant to *Dunlap v. Commonwealth*, 435 S.W.3d 537, 582 (Ky. 2013). Before addressing

---

[4] Canada identified six jurors he would have stricken had he not had to use his peremptory strikes on the five jurors that the trial court should have dismissed. In *Floyd v. Neal*, 590 S.W.3d 245, 253 (Ky. 2019), this Court stated that to preserve a for-cause strike error for review that a one-to-one ratio of for cause strikes to would-be peremptory strikes is required. However, since this trial pre-dated that decision the issue is still preserved in this case.

this issue, we note that because of the Austin City Saloon crimes, specifically a murder in the course of first-degree robbery, both Defendants were subject to the death penalty. The Commonwealth gave notice of its intent to seek the death penalty and thus jury selection included both group and individual voir dire.

## A. Extra peremptory strikes and the *Dunlap* issue

RCr 9.40 gives a defendant eight peremptory challenges plus one additional challenge if alternate jurors are seated. As construed by this Court in *Springer v. Commonwealth*, 998 S.W.2d 439, 444 (Ky. 1999), in a joint trial with two co-defendants if additional jurors are seated, the defense is entitled to thirteen peremptory strikes. Nine of these are joint strikes and then each defendant can exercise two independent challenges.

While trial courts are not required to grant extra peremptory strikes beyond those outlined in RCr 9.40, *Epperson v. Commonwealth*, 197 S.W.3d 46, 64-65 (Ky. 2006), trial judges sometimes provide extra strikes in major felony prosecutions, especially capital cases. This Court discussed awarding additional peremptory strikes in *Dunlap*, 435 S.W.3d at 537. In that case, the defendant argued that the trial court improperly denied his request to remove four jurors for cause. After addressing each of the challenged jurors, this Court concluded that one of the jurors should have been excused for cause, but the error was not reversible. *Id.* at 582. The trial court had provided the defendant with eleven peremptory strikes — two more than required under RCr 9.40 — while the Commonwealth only received the nine strikes provided for in

the rule. *Id.* As a consequence, the defendant was able to remove the juror with one of his extra strikes without forfeiting the strikes he was entitled to under RCr 9.40. *Id.* This Court held:

> The trial court's wise decision to accord extra peremptory strikes to Appellant assured that one, or even two, errors in "for cause" determinations would not unfairly impact Appellant's "substantial rights" in the jury selection process by essentially giving him fewer peremptory strikes than the Commonwealth." *Id.*, citing *Shane v. Commonwealth*, 243 S.W.3d 336, 340-41 (Ky. 2007) . . . .

*Id.* The *Dunlap* Court then summarized:

> To be clear, a trial judge acts within his or her discretion where, as here, he or she grants a criminal defendant more peremptory strikes than the Commonwealth receives. Trial judges are not impervious to errors in "for cause" strike determinations. Of course, at a certain point, a trial judge abuses his or her discretion by granting a criminal defendant *too many* extra strikes.

*Id.* Because *Dunlap* was a capital case, the Court concluded that the trial court acted well within its discretion by awarding the defendant two extra peremptory strikes. *Id.* More importantly, even though the trial court erred in not striking one of the challenged jurors, Dunlap did not lose the value of his peremptory strikes under our criminal rules.

The present case also involves extra peremptory strikes, but the issue is more complex than *Dunlap* because the trial court gave extra strikes to both the Commonwealth and the defense. Given the complexity of this issue, it is important to understand exactly how RCr 9.40 works and what the trial court did in this case. RCr 9.40 states in its entirety:

> (1) If the offense charged is a felony, the Commonwealth is entitled to eight (8) peremptory challenges and the defendant or defendants jointly to eight (8) peremptory challenges. If the offense charged is

a misdemeanor, the Commonwealth is entitled to three (3) peremptory challenges and the defendant or defendants jointly to three (3) peremptory challenges.

(2) If one (1) or two (2) additional jurors are called, the number of peremptory challenges allowed each side and each defendant shall be increased by one (1).

(3) If more than one defendant is being tried, each defendant shall be entitled to at least one additional peremptory challenge to be exercised independently of any other defendant.

Here, the Commonwealth and the Defendants jointly were awarded the standard eight peremptory strikes under subsection (1) because this is a felony case. Additional jurors were seated in this case, meaning that under subsection (2) the Commonwealth was awarded an additional strike, bringing its total to nine strikes. Under subsection (2), the defense "side" was awarded one additional joint strike, and then each Defendant received an additional strike. Moving to subsection (3), each Defendant was awarded one additional strike because it was a joint trial. Therefore, pursuant to RCr 9.40, the Commonwealth was entitled to nine (9) peremptory strikes and the Defendants were entitled to a total of thirteen (13) peremptory strikes. To summarize, as this Court did in *Springer v. Commonwealth*, 998 S.W.2d at 444, under the rule the authorized peremptory challenges were:

The Commonwealth's strikes:

| | |
|---|---|
| RCr 9.40(1) - | 8 strikes |
| RCr 9.40(2) - | 1 strike |
| RCr 9.40(3) - | no strikes |

**Total: 9 strikes**

The Defendants' strikes:

| | |
|---|---|
| RCr 9.40(1) - | 8 strikes jointly |
| RCr 9.40(2) - | 1 strike jointly |
| RCR 9.40(2) - | 1 strike Canada, 1 strike Mulazim |
| RCr 9.40(3) - | 1 strike Canada, 1 strike Mulazim |

**Total: 13 strikes**

After the first part of subsection (2) is applied — the language regarding "each *side*" receiving an additional strike — both the Commonwealth and the Defendants are evenly matched with nine strikes each. As noted *supra,* in *Springer,* the Court interpreted subsection (2) to mean that not only does each side get one additional strike but then "each defendant" gets one additional strike. 998 S.W.3d at 444.

The result of applying RCr 9.40 in a case such as this, where there is an additional juror seated and there are two co-defendants, is that the two sides are evenly matched at nine (9) peremptory strikes, then each Defendant gets two (2) additional strikes for a total of thirteen (13) strikes. Here, however, both sides were evenly matched at twelve (12) strikes because the trial court gave both the Defendants and the Commonwealth extra strikes. Thus, twelve (12) strikes is the baseline but the Defendants are entitled to the benefit built into RCr 9.40, *i.e.,* two (2) extra strikes each. In this case, the trial court went further and gave each Defendant four (4) additional extra strikes for a total of twenty (20) strikes.

Taking the extra strikes into consideration, both the Commonwealth and the Defendants were evenly matched at twelve (12) strikes but each Defendant needed to have at least two (2) strikes to exercise independently in order to receive the full benefit accorded the defense in RCr 9.40. With this analysis, the Defendants should have been able to exercise sixteen (16) peremptory strikes. The Defendants now argue that five jurors should have been stricken for cause, and because they were not stricken, they ultimately had to use their peremptory challenges on these jurors. When considering the numbers outlined above, however, the only way the Defendants could have been harmed is if their number of strikes fell below sixteen (16), which represents the baseline number of strikes allotted to both sides, twelve (12), plus the two (2) additional strikes each Defendant is entitled to under the rule (2+2=4).

The bottom line is that the trial court could have erroneously failed to exclude four (4) jurors for cause, and the Defendants would still have received everything they were entitled to under RCr 9.40. Essentially, the extra peremptory strikes granted by the trial court have the potential to insulate the result from reversal and in this case they did. We now address the arguments regarding two of the five jurors, both of whom the trial court correctly allowed to continue in the jury pool despite the Defendants' for-cause challenges.

## B. For-cause challenges

"When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." RCr 9.36(1). "Whether to exclude a juror for cause

lies within the sound discretion of the trial court, and on appellate review, we will not reverse the trial court's determination unless the action of the trial court is an abuse of discretion or is clearly erroneous." *Hilton v. Commonwealth*, 539 S.W.3d 1, 11 (Ky. 2018) (citations omitted). The erroneous failure to excuse a juror for cause "necessitating the use of a peremptory strike is reversible error," *id.* at 12, unless as here, the provision of extra peremptory strikes has avoided reversible error because the Defendants received everything (and perhaps more than) they were entitled to under RCr 9.40.

### i.    Juror 5132

During voir dire, Juror 5132 stated that he used to go to Austin City Saloon as recently as six or seven years ago when he lived in an apartment complex nearby. When a group of prospective jurors was later invited by the trial court to share any additional information they believed the court should be aware of, this juror approached the bench and explained that someone was murdered near his apartment complex approximately one year prior. Juror 5132 was the person that called 911 and was interviewed by the police. He no longer lives in the apartment complex. When asked by the trial court, he twice stated that incident would not impact his ability to listen to the evidence as presented. Juror 5132 was not a crime victim, and he did not witness a crime. He simply came upon the aftermath of a crime and called 911.

Mulazim and Canada argue that this juror's experience with the murder near his apartment was traumatic and that it is reasonable to believe that this

trauma would impact his views of this case and impair his ability to render an impartial verdict. We disagree. The trial court did not abuse its discretion in denying the motion to strike Juror 5132 for cause because the juror's knowledge of the murder at his apartment complex was minimal and he recognized it as a separate event with no bearing on the present case. Juror 5132 stated specifically that his experience was not relevant to this case and that he could undoubtedly separate the events and render a decision based on this case and the evidence presented. He stated that he knew very little about the underlying facts in the issue at his apartment other than it was a domestic dispute, and while he was impacted immediately after that event, it was over a year ago and would have no impact on him as a juror.

Mulazim and Canada also challenge the failure to strike Juror 5132 because they allege he expressed an inability to consider mitigating evidence. During individual voir dire the trial court advised Juror 5132 of the five possible penalties for aggravated murder, including the death penalty. The juror affirmed he could consider the full range of penalties in the event the Defendants were found guilty. Juror 5132 also affirmed that he could consider mitigators in a penalty phase of trial, including age, background information such as childhood and where a person grew up, and mental disorders. He also stated later he could consider mitigators such as having a "rough background" or a low IQ. When defense counsel asked about whether he considered age and IQ to be mitigating, he said no. He essentially stated that even with age and IQ that without a mental disability "you still know what you should be doing and

what you shouldn't be doing." When later asked about anything else he might consider in mitigation, he stated he might consider a person's upbringing.

At worst, this juror's responses about mitigating factors were ambiguous. When questioned by the trial court, he initially stated that he could consider a wide range of mitigating factors during the penalty phase, but later stated he could not consider two mitigating factors — age and IQ. He affirmatively stated that he could consider a person's "rough background" and IQ when questioned by the Commonwealth.

In *Harris v. Commonwealth*, 313 S.W.3d 40 (Ky. 2010), this Court addressed potential jurors who were similarly challenged by the defense for an alleged unwillingness to consider mitigators. This Court's unanimous decision by Justice Venters is highly instructive.

> Finally, none of these jurors was disqualified because of an unwillingness to consider mitigating evidence. As noted above, in cases such as *Penry, Eddings,* and *Morgan,* the United States Supreme Court has held that a capital defendant is entitled to present mitigating evidence to the jury, that the jury must be allowed to give effect to that evidence if it is so inclined, and that a juror who would give no effect to any mitigating evidence but would always vote to impose the death penalty for a capital crime is disqualified. There is no entitlement, however, to a jury or to individual jurors committed at the outset to view particular mitigating factors as having a mitigating effect. *Walker, supra* (lack of significant criminal history); *Winstead v. Commonwealth,* 283 S.W.3d 678 (Ky. 2009) (poverty and difficult family life); *Fields, supra* (intoxication); *Sherroan v. Commonwealth,* 142 S.W.3d 7 (Ky. 2004) (troubled background); *Stopher, supra* (voluntary intoxication). Jurors 26, 29, and 86 were not disqualified, therefore, merely because they stated that particular factors, such as lack of a significant criminal history or domination by another person (juror 26); low IQ, an abusive childhood, or the lack of a significant criminal record (juror 29); youth, an abusive childhood,

or intoxication (juror 86); were facts not likely to have much bearing on their penalty decisions.

*Id.* at 47. Thus, Appellants err in arguing that Juror 5132 had to be stricken if he had reservations about particular mitigating factors.

Despite stating that a person should know right from wrong regardless of age and IQ, Juror 5132 also stated that he could consider all mitigating circumstances when prompted by the trial court, and later affirmed that he could consider certain mitigating factors. Additionally, when asked about the range of possible penalties, he stated that he would have to consider a person's life prior to the crime. The determination as to whether to exclude a juror for cause "is based on the totality of the circumstances . . . and not on a response to any one question." *Hunt v. Commonwealth*, 304 S.W.3d 15, 43 (Ky. 2009). Based on all the juror's responses and *Harris*, the trial court did not abuse its discretion in denying the challenge on these grounds.

### ii.    Juror 5328

Mulazim and Canada argue that this juror should have been stricken for cause because he would not consider age, IQ or mental illness in mitigation. After reviewing voir dire and given our *Harris* guidelines, we disagree.

The trial court questioned Juror 5328 at the outset of individual voir dire and the juror confirmed that he could consider things such as background, upbringing, childhood experiences, education, trauma, and mental health issues. He also confirmed that he could consider age and IQ. Mulazim and Canada point to one instance where counsel asked him if he could consider whether being a young adult, having a low IQ or mental health issue would be

a reason to give a lesser sentence and the juror said no. However, we note that this question came toward the end of the questioning and after a long series of different hypotheticals. Additionally, even after responding "no," this juror again reiterated that one must look at everything and decide accordingly.

After defense counsel asked him the question about being a young adult or having a low IQ or mental health issue, the Commonwealth attempted to clarify his responses. The following exchange occurred:

> Commonwealth: So, I guess the question at the end of the day is if the judge instructs you to consider all of those mitigating factors, being age, IQ, background, upbringing, could you give them all meaningful consideration?

> Juror 5328: You have to. How can you not?

Throughout voir dire, this juror repeatedly stated that he would want and need to know everything about a crime — a person's background, why they committed the crime, their upbringing, how they were raised — and noted that these factors could "change things." When counsel asked whether a defendant accused of murder having a rough upbringing would be a reason to give a lesser sentence, he said he was not sure and that he would have to hear everything. He repeatedly indicated that sentencing is not something to be taken lightly and stated that he would to look at everything and assign a punishment on an individual basis. When asked broadly about his understanding of mitigators, he stated that you have to look at socioeconomic background and a person's upbringing. The juror even referenced considering mitigators and stated that he would not be able to decide without looking at

everything, classifying it as a huge factor in the decisions jurors are tasked with making.

Mulazim and Canada argue that Juror 5328 only wanted to consider motive in mitigation of a murder. Consideration as to the reasons or motivation for murder is a relevant factor in assessing a penalty. Again, as with the juror above, the trial court must consider the totality of the circumstances. *Hunt*, 304 S.W.3d at 43. Juror 5328 repeatedly and unequivocally stated that he would have to consider numerous factors in imposing a penalty, most of those being mitigating factors under KRS 532.025.

It appears that Mulazim and Canada simply wanted this prospective juror to assess certain factors more than others. But a defendant is not entitled "to a jury or to individual jurors committed at the outset to view particular mitigating factors as having a mitigating effect." *Harris*, 313 S.W.3d at 47. As in *Harris*, this juror should not have been disqualified merely because he once stated, despite otherwise contradicting, that he would not consider age and IQ as mitigating factors. This juror repeatedly indicated that there were circumstances in which an aggravated murder would warrant a penalty other than death based on the facts of the case and that his decision on a penalty would not only be based on the crime but the circumstances as well. The trial court clearly did not abuse its discretion in failing to strike this juror for cause.

Having concluded that the trial court did not err as to two of the challenged jurors (Jurors 5132 and 5328), we need not dissect the voir dire of

the remaining three jurors who were challenged because assuming arguendo the trial court erred on all three, the Appellants would still have had seventeen (17) peremptory challenges, one more than they were entitled to in order to maintain the defense advantage built into RCr 9.40. We reiterate that the trial court's and counsel's extensive inquiry into mitigators on individual voir dire only occurred because the case was tried as a capital offense due to the murder and robbery at the Austin City Saloon. Notably, no convictions occurred on those offenses and consequently the jury never considered aggravated penalties, rendering Appellants' focus on the jurors' ability to consider mitigation evidence questionable at best. In any event, Appellants have identified no reversible errors in the jury selection process.

## V. The information presented in the penalty phase complied with *Mullikan v. Commonwealth*.

Prior to the penalty phase, defense counsel inquired as to how the Commonwealth intended to prove Mulazim's and Canada's prior convictions, citing the limitations set by this Court in *Mullikan v. Commonwealth*, 341 S.W.3d 99, 109 (Ky. 2011). In the Commonwealth's penalty phase opening statement, the prosecutor stated that Canada had a felony conviction for first-degree wanton endangerment stemming from an attempt to push someone off a second story platform. Additionally, the Commonwealth told the jury that Mulazim was convicted of first-degree wanton endangerment on three separate occasions for unlawfully shooting a gun — twice for shooting at a home with people inside and once for shooting at someone. When the Commonwealth read from the indictments that led to the prior convictions, it provided the

same information. Mulazim and Canada now argue that the trial court violated KRS 532.055 and *Mullikan* by allowing the jury to hear evidence beyond the nature of their prior offenses.

KRS 532.055(2)(a) states in part that, in the sentencing stage in felony cases, "[e]vidence may be offered by the Commonwealth relevant to sentencing including: (1) [m]inimum parole eligibility, prior convictions of the defendant, both felony and misdemeanor; (2) [t]he nature of prior offenses for which he was convicted . . . ." In *Mullikan*, this Court held that "the evidence of prior convictions is limited to conveying to the jury the elements of the crimes previously committed. We suggest this be done either by a reading of the instruction of such crime from an acceptable form book or directly from the Kentucky Revised Statute itself." *Mullikan*, 341 S.W.3d at 109.

In William S. Cooper and Donald P. Cetrulo, *Kentucky Instructions to Juries, Criminal* § 3.58 (6th ed. 2019), the elements of first-degree wanton endangerment are captured in the following jury instructions:

    A. That in this county on or about _____ (date) and before the finding of the Indictment herein, he _____ (method);

    B. That he thereby wantonly created a substantial danger of death or serious physical injury to _____ (victim);

    AND

    C. That under the circumstances, such conduct manifested extreme indifference to the value of human life.

Telling the jury that Mulazim twice shot at homes while people were inside and that he once shot at someone is necessary to identify the method he used to commit the offenses. Similarly, informing the jury that Canada attempted to

push someone off a second story platform is necessary to explain his method of wanton endangerment, *i.e.*, the way in which he placed the victim in substantial danger and exhibited "extreme indifference to the value of human life." The Commonwealth followed the elements listed in Cooper's *Instructions* when it presented Appellants' prior convictions. The explanations of the methods by which the criminal offenses were committed were not error.

## VI. Shackling the Appellants during the penalty phase was error but harmless.

Just prior to the jury returning to the courtroom with their verdicts in the guilt phase, the trial court asked all present in the courtroom to remain calm and exercise restraint. When the trial court read that Canada was found not guilty of murder in the Austin City Saloon incident, Mulazim hit the table three times and Canada raised his arms. The rest of the jury's verdicts were read without issue.

The next day defense counsel reminded the trial court that the Fayette County jail staff has a policy of using ankle shackles on defendants absent an instruction from the court to remove those restraints. Defense counsel asked for the shackles to be removed, but the trial court refused, stating:

> I was asked that they be in in restraints, and after what happened
> last night I agreed to have them in restraints this morning, so I'm
> not removing the restraints from the Defendants. They are
> convicted now of additional charges and I'm not removing the
> restraints. So, it's noted but . . . they did ask me that, well they
> didn't ask me but they told me they were going to do that unless I
> instructed them otherwise. And I said that I would not be
> instructing them otherwise. I mean, despite my warning about no

outbursts, he did it anyway. And so, it's unfortunate but that's I just feel like that's appropriate under the circumstance.[5]

Both Defendants then entered the courtroom for the penalty phase in ankle shackles. Once the Defendants were seated at their respective tables, the jury was brought into the courtroom. Thus, as the Commonwealth emphasizes, the jury did not see the Defendants walking in shackles.

The Commonwealth further argues that based on the layout of the courtroom and the respective positions of the Defendants, jury and judge, it was impossible for the jury to see the Defendants' shackles. Given the subpar video quality of the penalty phase proceedings, we cannot assess whether the shackles were visible to the jury. However, given that the Defendants were only shackled at the ankles and were seated with their feet underneath the table, we think it is unlikely that the jury noticed the shackles. As noted, the jury did not witness the Defendants walking into the courtroom while shackled.

"Shackling of a defendant in a jury trial is allowed only in the presence of extraordinary circumstances." *Barbour v. Commonwealth,* 204 S.W.3d 606, 612 (Ky. 2006) (citing *Peterson v. Commonwealth,* 160 S.W.3d 730, 733 (Ky. 2005)). Disfavor of the practice is also reflected in RCr 8.28(5), which states that "[e]xcept for good cause shown the judge shall not permit the defendant to be seen by the jury in shackles or other devices for physical restraint." When

---

[5] It is unclear from the record who requested that the Defendants remain in shackles. In its brief, the Commonwealth posits that the request was made by the corrections officials or deputies of the Fayette County Sheriff's Office. The colloquy during Canada's objection to shackling suggests that the Commonwealth did not make the request.

reviewing a trial court's decision to keep a defendant in shackles in the presence of the jury, we give great deference to the trial court. *Barbour*, 204 S.W.3d at 612. However, there generally must be "substantive evidence or [a] finding by the trial court that Appellant was either violent or a flight risk . . . ." *Id.* at 614. The trial court's decision to keep a defendant in shackles is reviewed for an abuse of discretion. *Id.*

The *Barbour* Court cited cases illustrating the type of exceptional circumstances justifying the need for shackling. *Hill v. Commonwealth*, 125 S.W.3d 221, 235-36 (Ky. 2004), involved a defendant who was appropriately shackled due to his prior escape and his skills in martial arts. In *Peterson*, 160 S.W.3d at 734, the defendant's belligerent conduct prior to trial and refusal to acknowledge the need to control his behavior during trial, raised a serious issue of courtroom security justifying shackles. In *Commonwealth v. Conley*, 959 S.W.2d 77, 78 (Ky. 1997), the defendant had fled the courtroom during a prior appearance and the court had good reason to believe it might occur again. "These cases illustrate the sort of limited circumstances, complete with specific trial court findings, that have justified allowing a defendant to remain shackled before the jury." *Barbour*, 204 S.W.3d at 613.

In this case the shackling of the Defendants was based on a finding that Mulazim and Canada specifically disregarded the court's instruction to remain calm while the verdict in the guilt phase was read. The trial court determined that shackling was appropriate under the circumstances, especially considering that the men had just been found guilty of serious charges.

Mulazim and Canada argue that the shackling was prejudicial because the restraints sent a message to the jury that they were dangerous men and deserved long sentences.

Despite the arguably aggressive nature of Mulazim's outburst, we recognize that banging on the table was most likely done in celebration, not to intimidate or be violent. While we do afford great deference to the trial court in making these determinations, we do not consider this to rise to the level of "extraordinary circumstances" as seen in cases in which shackling was upheld. Additionally, even if the trial court determined that due to the outburst Mulazim should be shackled, this decision could not extend to Canada who merely raised his arms when the trial court stated he was acquitted on the murder charge. We conclude that the decision to shackle the Defendants in this case was an abuse of discretion.

However, this error is subject to the harmless error analysis under RCr 9.24, which states we "must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties." In *Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009), we noted that a non-constitutional error is harmless "if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." (citing *Kotteakos v. United* States, 328 U.S. 750 (1946)). After reviewing all of the circumstances, we do not believe the shackles, assuming the jury was able to see them, substantially impacted the sentences the Defendants received.

The admittedly serious sentences received by the Defendants are unsurprising given the egregious nature of the crimes charged and ultimate convictions. Both men were charged with murder and three counts of first-degree robbery, all violent offenses.[6] Additionally, during the penalty phase, the jury heard that they had numerous prior convictions, including convictions for wanton endangerment, assault, robbery, burglary, and fleeing from police. We cannot say that given their new convictions and Mulazim's and Canada's criminal histories, the mere possibility that the jury saw the shackles impacted the sentencing.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Fayette Circuit Court.

All sitting. All concur.

---

[6] While the jury acquitted Canada of murder and was hung on Mulazim's murder charge, according to CourtNet, Mulazim was subsequently convicted of Jonathan Price's murder and sentenced to life imprisonment without the possibility of parole.

COUNSEL FOR APELLANT,
DAWAN Q. MULAZIM:

Robert Chung-Hua Yang
Steven Jared Buck
Assistant Public Advocates
Department of Public Advocacy


COUNSEL FOR APPELLANT,
QUINCINIO DEONTE CANADA:

Aaron Reed Baker
Eric Hoffman Yang
Assistant Public Advocates
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

James Coleman Shackelford
Joseph A. Newberg II
Assistant Attorneys General
Office of Criminal Appeals