# Supreme Court of Kentucky

2018-SC-0605-MR


RICARDO D. TAYLOR                                            APPELLANT


ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.          HONORABLE BARRY WILLETT, JUDGE
NO. 16-CR-000480


COMMONWEALTH OF KENTUCKY                                      APPELLEE

AND


2018-SC-0613-MR


CONRAI ANDRE KABALLAH, JR.                                   APPELLANT


ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.          HONORABLE BARRY WILLETT, JUDGE
NO. 16-CR-000480-003


COMMONWEALTH OF KENTUCKY                                      APPELLEE

## ORDER DENYING PETITIONS FOR REHEARING

## AND MODIFYING OPINION

The Petitions for Rehearing, filed by the Appellants, Ricardo D. Taylor and Conrai Andre Kaballah, Jr., of the Opinion of the Court, rendered August 20, 2020, are DENIED, and the Opinion of this Court is modified by substitution of the attached Opinion in lieu of the original Opinion. Said modification does not affect the holding of the original Opinion of this Court.

All sitting. All concur.

ENTERED: December 17, 2020.

_____
CHIEF JUSTICE MINTON

MODIFIED: DECEMBER 17, 2020
RENDERED: AUGUST 20, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-0605-MR

RICARDO D. TAYLOR                              APPELLANT

           ON APPEAL FROM JEFFERSON CIRCUIT COURT

V.                  HONORABLE BARRY WILLETT, JUDGE

                          NO. 16-CR-000480

COMMONWEALTH OF KENTUCKY                  APPELLEE

AND

## 2018-SC-0613-MR

CONRAI ANDRE KABALLAH, JR.                  APPELLANT

           ON APPEAL FROM JEFFERSON CIRCUIT COURT

V.                  HONORABLE BARRY WILLETT, JUDGE

                         NO. 16-CR-000480-003

COMMONWEALTH OF KENTUCKY                  APPELLEE

**OPINION OF THE COURT BY JUSTICE VANMETER**

**<u>AFFIRMING</u>**

A jury convicted Conrai Kaballah of Criminal Attempt – Murder, First-Degree Assault, and of being a Persistent Felony Offender in the Second Degree ("PFO2"). Kaballah's co-defendant, Ricardo Taylor, was convicted of Criminal Attempt – Murder, First-Degree Assault, First-Degree Sodomy, Tampering with Physical Evidence, and of being a Persistent Felony Offender in the First Degree ("PFO1"). Both defendants were sentenced to life imprisonment. Kaballah and Taylor appeal as a matter of right[1] and allege several claims of error: (1) the trial court abused its discretion by not granting a continuance upon the release of the identity of the Commonwealth's key witness the week prior to trial; (2) the trial court abused its discretion when it deferred disclosure of the Commonwealth's key witness; (3) the Commonwealth committed a *Brady*[2] violation by deferring disclosure of the key witness's identity and reduction in sentence during trial; (4) the trial court violated the defendants' Sixth Amendment right to compulsory process by allowing attorneys for the seven other co-defendants to announce their clients' intention to invoke their Fifth Amendment right to avoid self-incrimination; (5) the trial court erred by allowing both defendants to be convicted of both First-Degree Assault and Criminal Attempt – Murder, both based on the same act; (6) the trial court erred by failing to conduct a *Hall*[3] analysis of the photographs taken of the victim's injuries; (7) reversible error occurred when both defendants were not

---

[1] Ky. Const. §110(2)(b).

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

[3] *Hall v. Commonwealth*, 468 S.W.3d 814 (Ky. 2015).

2

*Mirandized*[4] prior to being interrogated shortly after the assault occurred; (8) the trial court erred by allowing a transcript—commissioned by the Commonwealth—of a phone call Taylor made from jail to be shown during closing arguments; and (9) cumulative error demands reversal. After an extensive review of the record and applicable law, we find that both defendants should have been *Mirandized* prior to being interrogated and the transcript of Taylor's phone call should not have been shown to the jury during closing arguments. However, due to the overwhelming evidence against the defendants, and the inconsequential nature of the evidence produced from these errors, both errors were harmless as a matter of law. Thus, we affirm the judgment and sentence of the trial court.

## I. Factual and Procedural Background.

Taylor and Kabballah were housed in the same dormitory as Cedric Weaver at the Louisville Metro Detention Center. On November 13, 2014, Weaver asked Taylor and another inmate if they could move their chess game, so he could watch the television. When they refused, Weaver picked up all their chess pieces. That night, a group of inmates in Weaver's dorm room dragged him out his bed and violently assaulted him for an extended period of time. At some point, Taylor anally sodomized Weaver with the handle of a toilet brush found in the dorm room. The Special Operations and Response Team ("SORT") eventually broke up the situation by shooting percussion rounds into the dorm and physically restraining those involved.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

3

Louisville Metro Department of Corrections Sergeant Melinda Zapata was the first to see Weaver after he was assaulted. She testified that he was sitting on his bunk, bleeding from his head which was "as big as a basketball," and that "his ear was hanging off his head." Weaver suffered a traumatic brain injury. He had to undergo months of physical therapy, speech therapy, and occupational therapy. It took seven months of physical therapy before Weaver learned to walk again.[5]

Ten defendants were indicted for the incident; nine defendants remained the week before trial. Just prior to trial, seven of these defendants pled guilty to various charges arising out of the assault. This left Taylor and Kaballah as the only remaining defendants at trial. Both men were convicted of multiple counts and sentenced to an enhanced term of life in prison. This appeal followed. Any further pertinent facts will be discussed as they arise below.

## II.     Analysis.

The first two issues below are based on the Commonwealth's use of Luke Payne as a key witness in the trial of Taylor and Kaballah. On October 31, 2016, the trial court deferred disclosure of Payne's identity until forty-eight hours prior to his testimony to protect his safety while incarcerated. On December 4, 2017, the trial court set the trial date to June 26, 2018. Prior to trial, Payne received eight years to serve after pleading guilty to second-degree robbery. A persistent felony offender charge was dismissed. The Commonwealth, per the trial court's orders, disclosed Payne's identity to the

---

[5] Additionally, Weaver suffered severe injuries to his ear, his eyes, and his nose.

4

defense on June 22, 2018, three days before the start of the trial. During the final pre-trial conference on June 25, 2018, the Commonwealth informed the trial court that it had revealed Payne's identity to Taylor and Kaballah. Moody, then a co-defendant, played a video recording of Payne's guilty plea that he obtained from the clerk's office. Moody moved to dismiss the indictment after alleging that the Commonwealth did not disclose that Payne received a favorable plea arrangement in exchange for testifying at the trial. Taylor and Kaballah joined the motion. The next day the motion was renewed and subsequently denied by the trial court. Moody then moved for a continuance to investigate Payne and the alleged deal made with the Commonwealth, which Taylor and Kaballah joined. The trial court denied the motion for a continuance. Taylor and Kaballah appeal this denial.

A. The Trial Court Did Not Abuse its Discretion in Denying Defendants' Motion to Continue.

All parties agree the issues are preserved for review. Taylor and Kaballah joined the motion for a continuance that was denied by the trial court. Motions for a continuance are governed by RCr[6] 9.04 which permits a trial court to grant a continuance "upon motion and sufficient cause shown by either party." The trial court has wide discretion when deciding whether to grant a motion for a continuance. *Hilton v. Commonwealth*, 539 S.W.3d 1, 10–11 (Ky. 2018). The question of whether a motion for a continuance should be granted is determined by the "unique facts and circumstances" of the case. *Id.* at 11.

---

[6] Kentucky Rules of Criminal Procedure.

5

This Court will determine the trial court abused its discretion if its decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 7.

In exercising its discretion, the trial court must take into account certain factors. S*nodgrass v. Commonwealth*, 814 S.W.2d 579, 581 (Ky. 1991), *overruled on other grounds by Lawson v. Commonwealth*, 53 S.W.3d 534 (Ky. 2001)). The trial court must consider the: 1) length of delay; 2) number of previous continuances; 3) inconveniences to parties, witnesses, counsel, and the court; 4) complexity of the case; 5) availability of other competent counsel; 6) whether the movant sought delay for his own sake or caused the need for it and; 7) whether a denial of the continuance would lead to identifiable prejudice. *Id.* An analysis of the *Snodgrass* factors shows the trial court did not abuse its discretion when it denied the motion for a continuance.

Looking at the relevant *Snodgrass* factors for this case, Taylor and Kaballah simply requested a "reasonable amount of time" for the continuance rather than a concrete length of time. Thus, the length of the delay requested is not enough to support that the trial court abused its discretion. Additionally, while there had been no previous continuances in this case, the inconvenience to litigants, counsel, and the court was great. The trial court noted during trial that the logistics were "a daunting task for everybody." There were nine defendants remaining at the time of this motion, some of whom were incarcerated in a corrections facility while others were on home incarceration, and some were in Louisville Metro Corrections while others were

6

in state facilities. The trial's size made transportation, logistics, and scheduling difficult. The trial court is entitled to consider the consequences of granting a continuance for such a logistically complex trial and could have reasonably found that the complexity of the case outweighed the need for additional investigation into Payne. A continuance would have exacerbated these inconveniences to the litigants, counsel, and the court.

Ultimately, Taylor and Kaballah fail to show any identifiable prejudice. This Court has emphasized that identifiable prejudice is "especially important." *Bartley v. Commonwealth*, 400 S.W.3d 714, 733 (Ky. 2013). A defendant must "state with particularity how his or her case will suffer if the motion to postpone is denied." *Id.* (citing *Hudson v. Commonwealth*, 202 S.W.3d 17, 23 (Ky. 2006)); *see also Turner v. Commonwealth*, 544 S.W.3d 610, 620 (Ky. 2018) (holding that while denial of a continuance prevented further investigation into a defense, moving counsel failed to identify any additional action she could have taken if given additional time). In *Morgan v. Commonwealth*, the first six factors weighed in favor of granting a continuance, but there was no identifiable prejudice when the testimony of a witness changed the morning of trial, because counsel could still cross-examine and impeach the witness while he testified. 421 S.W.3d 388, 393 (Ky. 2014).

Here, while Taylor and Kaballah argued they could not perform an adequate investigation of Payne, they were still able to cross-examine him extensively and attack his credibility in front of the jury. The defendants' briefs both emphasize the amount of discovery material given to them three days

7

before trial began; however, they did not mention this when they moved for a continuance. While post-trial review may show that more time could have helped the defendants, the identifiable prejudice and specific actions they would have taken were not fully presented to the trial court.

Additionally, the defendants argued they needed a continuance to investigate a conspiracy between the Commonwealth and Payne regarding his sentence reduction. The trial court believed the Commonwealth's assertion that no arrangement was made between itself and Payne, and the defendants have presented no evidence on appeal furthering this conspiracy theory. This Court has repeatedly emphasized the trial court's broad discretion in continuance matters. *See McCoy v. Commonwealth*, 553 S.W.3d 816, 821 (Ky. 2018) (denial proper even when late discovery was received six days before trial); *Turner*, 544 S.W.3d at 620 (denial proper though case was complex and only thirty days requested because trial had been delayed for five years); *Hilton*, 539 S.W.3d at 11 (denial proper because delay would have caused inconvenience for trial court and witnesses, and court was not sure if date could be moved); *Hudson*, 202 S.W.3d at 23 (denial proper in a case that was not complex where moving counsel needed to investigate a defense further); *Gosser v. Commonwealth*, 31 S.W.3d 897, 905 (Ky. 2000) (where case had been previously continued twice, denial proper even though Commonwealth failed to provide a witness's grand jury testimony until four days before trial).

When this Court has decided that a trial court improperly denied a motion for continuance, the trial court has clearly abused its discretion in not

8

considering the circumstances of the case. *See, e.g., Herp v. Commonwealth,* 491 S.W.3d 507, 512 (Ky. 2016) (trial court abused its discretion in denying motion when counsel was not given time to mount a defense after an amended indictment); *Darcy v. Commonwealth,* 441 S.W.3d 77, 82–83 (Ky. 2014) (trial court abused its discretion in denying motion when it only considered the defendant's statutory right to a speedy trial and did not consider *Snodgrass* factors). The trial in this case presented complex logistical arrangements due to the number of defendants. During the pretrial hearing, Taylor and Kaballah failed to identify specific actions they would have taken if the motion was granted. Therefore, the trial court did not abuse its discretion.

B. The Trial Court Properly Delayed Disclosure of a Key Witness's Identity.

All parties agree this issue is preserved for review. Deferred or delayed disclosure is permitted by the trial court under RCr 7.24(8) which states:

> On a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted or deferred, or make such other order as is appropriate. On motion, the court may permit the Commonwealth to make such showing, in whole or part, in the form of a written statement to be inspected by the court privately; and if the court thereupon grants relief following such private inspection the entire text of the Commonwealth's statement shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal by the defendant.

On October 31, 2016, the Commonwealth moved for deferred or delayed disclosure of Payne's identity as a witness due to concerns about his safety in prison before he testified. In accordance with RCr 7.24(8), the Commonwealth provided the trial court with a written statement. Trial courts have wide discretion in interpreting this rule and determining whether delayed disclosure

9

is warranted.  *See Commonwealth v. Nichols*, 280 S.W.3d 39, 43 (Ky. 2009) ("[B]road discretion in discovery matters has long been afforded [to] trial courts in both civil and criminal cases[]").   After review of the facts and relevant case law, we hold that the trial court did not abuse its discretion in deferring disclosure of Payne's identity.

In *Burks v. Commonwealth,* the trial court refused to compel the Commonwealth to reveal the identity of its key witness.  Our predecessor court found that the trial court abused its discretion in never requiring the Commonwealth to produce the material witness's identity.  471 S.W.2d 298, 301 (Ky. 1971).  In *State v. McKelton*, the Ohio Supreme Court rejected an argument that deferred disclosure of a witness's identity until before trial violated the defendant's constitutional right to due process and effective assistance of counsel.  70 N.E.3d 508, 539 (Ohio 2016).  The court emphasized the trial court's broad discretion to postpone disclosure of the identity of a witness in order to protect his/her safety.  *Id.*; *see also People v. Rose,* 794 N.E.2d 1004, 1007 (Ill. App. Ct. 2003) (noting that disclosure of a witness will generally give way to a defendant's right to prepare his defense unless the witness's safety is at stake); *Butler v. State*, 372 N.E.2d 190, 193 (Ind. Ct. App. 1978) (holding that to establish a sufficient interest in nondisclosure the state must demonstrate the witness would be subjected to harassment or physical danger).

In *Hawkins v. Commonwealth*, 536 S.W.3d 697, 704 (Ky. 2017), we declined to extend *Burks* on grounds that the trial court did not abuse its

10

discretion by denying defendant's ability to call a confidential informant, as the confidential informant was not a witness to the crime charged, and thus was not a material witness. Similarly, the present case can be distinguished from *Burks*. Unlike *Burks*, Payne's identity was not concealed indefinitely. His identity simply was not disclosed until just prior to trial in order to protect his safety.[7] The deferred disclosure allowed Payne to remain safe for as long as possible. The defense was still able to extensively cross-examine Payne at trial and was given three days beforehand to investigate.

Additionally, this Court's decision comports with our sister courts, all of whom underscored the importance of considering the witness's safety when deferring disclosure of an identity. Ohio maintained the trial court's broad discretion and Indiana placed the burden on the state to demonstrate deferred disclosure is warranted. Here, the Commonwealth met its burden by convincing the trial court that deferred disclosure was needed in order to protect Payne in prison. Payne was the Commonwealth's key witness in a multiple defendant trial, all of whom were incarcerated in some way with their freedom already severely restricted. As the Commonwealth noted, the defendants had less to lose in committing another assault on Payne since they were incarcerated, which could have derailed the trial. The trial court has broad discretion in deferred disclosures and insufficient evidence exists to determine it abused its discretion. Payne's safety was of paramount interest to

---

[7] The necessity of this protection was only further proven during trial, as Taylor made several threatening phone calls during trial regarding Payne's testimony.

the Commonwealth. The trial court properly exercised its discretion in weighing that interest against Taylor's and Kaballah's need for further investigation before they cross-examined him.

C. Payne's Further Sentence Reduction During Trial and Weaver's Federal Case Evidence Were Not *Brady* Violations.

The Appellants' briefs specifically allege a *Brady* violation due to an inferred cooperation agreement between the Commonwealth and Payne that was not adequately disclosed. Defendants received information *prior to trial* of Payne's guilty plea which included an eight-year prison sentence. After Payne's testimony and prior to the end of trial—but after proof had closed—the Commonwealth informed the trial court and defendants that Payne's sentence had been further reduced by three years the prior day by a court in another division allegedly based on threatening phone calls made by Taylor after Payne had testified.

In *Brady v. Maryland,* the United States Supreme Court opined that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). First, we note that "*Brady* only applies to 'the discovery, *after trial,* of information which had been known to the prosecution but *unknown to the defense.*'" *Bowling v. Commonwealth,* 80 S.W.3d 405, 410 (Ky. 2002) (quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

12

A tacit or explicit cooperation agreement represents material that must be turned over, *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008), but the defendant's mere speculation that such an agreement exists does not demonstrate a *Brady* violation. *Middleton v. Roper*, 455 F.3d 838, 854 (8th Cir. 2006). Even if not strictly a *Brady* violation, the delayed disclosure of *Brady* material can give rise to a cognizable due process violation, if made during trial, or even prior to trial, and the delay prevents the defense from meaningfully using the information. *See Finnell v. Commonwealth*, 295 S.W.3d 829 (Ky. 2009), *Silverburg v. Commonwealth*, 587 S.W.2d 241 (Ky. 1979); *see e.g. U.S. v. Burke*, 571 F.3d 1048 (10th Cir. 2009), *U.S. v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007).

The Commonwealth turned over evidence of Payne's sentence reduction—which had occurred only two days prior—*during trial.* Payne's sentence reduction was not a *Brady* violation as its existence was known prior to end of trial. Further, *Brady* turns on fair disclosure and does not create the right to discovery in a criminal trial. *Bowling*, 80 S.W.3d at 410. Additionally, the defense was aware of Weaver's federal case prior to trial and any public information regarding the case could have been obtained by the defense. As no specific allegation of exculpatory evidence being withheld until after trial has been raised, no *Brady* violation has occurred.

Turning to the more general due process question, the disclosure of Payne's revised sentence was not meaningfully delayed. The record does not contain any evidence of an agreement between Payne and the Commonwealth.

13

The additional sentence reduction was authorized by a different court division in Jefferson County and was allowed due to alleged threats made towards Payne after he testified in this case. The events giving rise to the need to disclose only occurred the prior afternoon and waiting approximately twenty minutes until after jury instructions were discussed did not meaningfully impact the defense's ability to use the information.

    D. No Sixth Amendment Violation Occurred.

Prior to trial, defendants' attorneys informed the attorneys for the other seven co-defendants that they intended to call their clients as witnesses during trial. All seven attorneys responded that their clients were going to invoke their Fifth Amendment rights against self-incrimination. Defendants' attorneys objected, arguing that each co-defendant needed to be questioned, outside the presence of the jury, in order to determine whether they were going to invoke the privilege, instead of allowing their attorneys to invoke the privilege for them.

Our precedent acknowledges that "neither the prosecution nor the defense may call a witness knowing that the witness will assert his Fifth Amendment privilege against self-incrimination, and we have applied this black-letter law in cases where a witness invokes the privilege in order to avoid answering *any* substantive questions." *Combs v. Commonwealth*, 74 S.W.3d 738, 742 (Ky. 2002) (citation omitted). No case law exists suggesting that an attorney cannot invoke his client's Fifth Amendment right against answering any questions. *See McLemore v. Commonwealth*, 590 S.W.3d 229, 239–40 (Ky.

14

2019) (trial court did not err in allowing attorney to invoke privilege against answering any questions for their client when questions would involve a crime the witness was potentially involved in). The present facts paint an even clearer picture of the necessity to avoid calling the other seven witnesses. These individuals were not just witnesses to a crime or potentially involved in a crime with the defendants; they were all co-defendants with Kaballah and Taylor just hours before this hearing took place. No doubt exists that any testimony they gave would be substantive and potentially incriminate each defendant. Thus, the trial court did not err in allowing their attorneys to invoke their Fifth Amendment privilege against self-incrimination without calling each co-defendant to the stand.

E. <u>Defendants' Multiple Convictions for the Same Act Were Erroneous, but the Trial Court's Remedy was Sufficient to Protect Both Defendants' Rights.</u>

At the close of trial, the jury was instructed on both attempted murder and first-degree assault. Both defendants were convicted of both crimes. Defendants moved to vacate the first-degree assault conviction pursuant to KRS 505.020 and also moved for a mistrial. The trial court instructed the jury that it could only sentence the defendants on the attempted murder charge but denied the mistrial motion.

In *Kiper v. Commonwealth*, this Court held that a conviction on attempted murder and first-degree assault for the same act violates a defendant's statutory double jeopardy rights under KRS 505.020(1)(b). 399 S.W.3d 736, 746 (Ky. 2012).

15

> [T]o convict a defendant of attempted murder, the jury must find that he specifically intended during the attack to kill the victim. *See* KRS 507.020, 506.010. On the other hand, and quite inconsistently, for the jury to convict the same defendant of first-degree assault for engaging in the same course of conduct, it must determine that his specific intent was not to kill, but merely to cause serious physical injury to the victim. *See* KRS 508.010. Therefore, as may easily be seen in the circumstances of this case, to convict Appellant for both attempted murder and first-degree assault, the jury had to conclude that Appellant intended to kill Burton and, at the same instant, intended not to kill him but only to injure him. These inconsistent and mutually exclusive findings of fact regarding Appellant's *mens rea* at the moment he fired the shots at Burton lead precisely to the result that KRS 505.020(1)(b) prohibits. It follows, therefore, that the judgment convicting Appellant for both attempted murder and first-degree assault is a violation of our statutory restraint on double jeopardy.

*Id.* at 744.

The remedy for this type of statutory double jeopardy violation is to vacate the lesser conviction, and only allow sentencing on the greater conviction. *Id.* at 746. While the trial court did not explicitly vacate the conviction at trial, it did not allow the defendants to be sentenced for first-degree assault, and the final judgment does not list a first-degree assault conviction. Thus, the trial court's actions at trial and its final judgment show that the first-degree assault charge was effectively vacated. Thus, any error from the statutory double jeopardy violation was cured below.

F. The Photographs of Weaver's Injuries Were Properly Admitted.

Prior to trial, multiple defendants objected to the photographs of Weaver's injuries being introduced at trial. The objections centered on the cumulative nature of the photographs. After reviewing the set of photographs, the trial court summarily overruled the objections and allowed introduction of

16

all 25 photographs showing various angles of Weaver's extensive injuries. Defendants argue that the trial court did not conduct the proper *Hall* analysis when determining the admissibility of the photographs. 468 S.W.3d 814, 824–26 (Ky. 2015).

In *Hall*, we held that a trial court must evaluate "visual media showing gruesome or repulsive depictions of victims . . . [by] conduct[ing] the Rule 403 balancing test to determine the admissibility of the proffered evidence." *Id.* at 823. This includes "weigh[ing] the probative value of the gruesome photo in question against the harmful effects that might flow from its admission to determine whether the photo should be excluded notwithstanding the general rule." *Id.* The argument from trial counsel below focused on the cumulative nature of the 25 injury photographs, not on their gruesome nature, as most photographs showed only severe bruising and were not extensively gruesome on their own. However, cumulative presentation of injury photographs can be unduly prejudicial and KRE[8] 403 "explicitly incorporates this concept by noting that a trial court is to consider 'needless presentation of cumulative evidence' in deciding whether to admit evidence." *Id.* at 824 (quoting KRE 403). Twenty-five photographs of a victim's injuries may be unduly prejudicial, depending on the facts of the case.

Here, Weaver suffered a litany of injuries, the compounding of which added to the Commonwealth's theory of attempted murder. The examining surgeon, Dr. Smock, testified that Weaver suffered a traumatic brain injury,

---

[8] Kentucky Rules of Evidence.

17

tears in his rectum, tears in his lower colon, a swollen ear, several pattern injuries, swelling of the left eye, a broken tooth, bruising on both sides of his neck, chest abrasions, abrasions on his buttocks, injuries on his back, contusions on his arms and shoulders, and abrasions on his arms, fingers, knees, and lower legs. The Commonwealth had no reasonable alternative to show that an attack using almost exclusively hands and feet rose to the level of attempted murder. Thus, the trial court did not err in allowing each photograph.

G. Defendants Should Have Been *Mirandized*, but Any Error was Harmless Beyond a Reasonable Doubt.

Immediately following the attack, prison officials entered the dorm and found Weaver injured. SORT threw percussion grenades and verbally ordered the inmates to get on the floor. Officials handcuffed Taylor and Kaballah and took them to a separate room that was set up like a typical office for an interview by two Public Integrity Unit Officers. Neither defendant was *Mirandized* before the interview. The door was closed, and neither was told they were free to leave. Taylor admitted that he was not "roughed up" or physically coerced, but that he was only cooperating in order to "eat chow." The officers asked Taylor repeatedly whether he was giving the statement of his own free will, and he repeatedly answered no.

*Miranda* warnings are required as procedural safeguards before the start of custodial interrogation to dispel the inherent compulsion of these settings and ensure that the defendant is aware of and able to assert his/her Fifth Amendment right against self-incrimination. *Miranda*, 384 U.S. at 458.

18

*Miranda* warnings are required when a person is interrogated and in custody. *Id.* at 460. If a defendant is interrogated while in prison, a separate set of factors is used to determine whether he was in custody for purposes of *Miranda*. *Howes v. Fields*, 565 U.S. 499, 508 (2012). A defendant in physical custody in a prison, without more, does not necessarily mean that he/she is in custody for the purposes of *Miranda*. *Id.* at 512. Taylor and Kaballah pass this first prong because they were physically in custody in prison, so their freedom of movement was restrained.

The "something more" required to move from physically in custody under a term of imprisonment, to in custody for purposes of *Miranda*, has not been explicitly defined by the Court, but the next step is to determine "whether the relevant environment presents the same inherently coercive pressures as the type of station-house questioning at issue in *Miranda*." *Id.* at 509. A court must consider the objective totality of the circumstances. *Stansbury v. California*, 511 U.S. 318, 323 (1994). This includes 1) the location of questioning; 2) the duration of the questioning; 3) statements made during the interview; 4) whether physical restraints were used; and 5) whether the defendant was released at the end of questioning. 565 U.S. at 511.

In *Howes*, the defendant, Fields, was interrogated in prison without *Miranda* warnings about a crime unrelated to his incarceration. *Id.* at 503. He was taken from his cell to a private room, was unrestrained, and questioned for five to seven hours, with the door open during part of the interrogation. *Id.* He was repeatedly told throughout the interrogation that he was free to leave and

19

return to his cell.  *Id.*  Fields was not in custody for *Miranda* purposes, so warnings were not required.  *Id.* at 514.  Although the questioning of Fields lasted five to seven hours, was conducted without Fields' consent, and with the presence of armed guards, this was outweighed by the fact that he was told repeatedly he could leave whenever he wanted, he was not physically restrained, or threatened, and the door remained open in a well-lit and normal-sized room.  *Id.* at 515.

Here, with respect to the location of questioning, Taylor and Kaballah were interrogated in separate rooms away from other inmates.  An isolated interrogation like this does not necessarily add to the coerciveness of an interview for *Miranda* purposes, but rather is often used as a safety measure for prisoners.  *People v. Cortez*, 832 N.W.2d 1, 9 (Mich. Ct. App. 2013).  A door remaining open in an isolated interrogation room can support a conclusion that a defendant was not in custody.  *Howes*, 565 U.S. at 515.  Thus, a closed door supports Defendants' argument that they were in custody.

The length of questioning initially appears to imply that neither defendant was in custody; however, one factor is not dispositive in a totality of circumstances analysis.  Although Kaballah's interrogation was significantly shorter than in *Howes* (one hour and nine minutes as compared to five to seven hours) it could still be more coercive.  *Id.*  A lengthy interrogation is but one factor that adds to coerciveness.  Kaballah was only interrogated for a little over an hour, however, he was isolated in an attorney booth for six and a half hours prior.  Additionally, although Taylor's interview was also relatively short

20

in length (though the exact time is not mentioned), Taylor was denied food during the interrogation. Further, Taylor did not give consent or willingly participate. On the contrary, he explicitly stated that he was being coerced. The presence of other coercive factors likely outweighs the shorter length of interrogation.

Regarding the nature of Taylor's and Kaballah's statements made during the interrogation, *Miranda* warnings are given to protect the Fifth Amendment privilege against self-incrimination. Taylor's and Kaballah's statements were not full confessions but were used in the Commonwealth's case-in-chief which supports the conclusion that the defendants were in custody.

The physical restraint factor also supports the conclusion that Taylor and Kaballah were in custody. Both defendants were restrained in handcuffs during the entire interrogation. The use of physical restraints only adds to the coercive nature of an interrogation. The use of restraints is not a neutral action in a custody analysis, but rather explicitly demonstrates that someone is being controlled. Restraints not only limit one's physical freedom of movement but create a more coercive environment—the main concern that *Miranda* warnings aim to remedy. *Miranda*, 384 U.S. at 467. Although not dispositive, this factor weighs in favor of the conclusion that the defendants were in custody.

Taylor and Kaballah were released back to their cells immediately after questioning which we have previously held supports a lack of custody. *See Smith v. Commonwealth*, 520 S.W.3d 340, 348 (Ky. 2017) (noting that a return

21

to a cell after an interrogation in prison is conceptually indistinguishable from an un-jailed suspect going home after an interrogation).  However, in the present case, this factor likely cuts the other way.  Both defendants were interrogated by Public Integrity officials who are a part of the Louisville Metro Police Department ("LMPD").  These are not the prison guards that the defendants see every day and may be comfortable with, but rather strangers who were brought in immediately following a crime, searching for the perpetrator.  As *Howes* mentioned, the same level of shock does not exist when one is taken from a cell to an interrogation room in prison as when someone is pulled from their house into a police station.  565 U.S. at 511.  However, an additional shock exists when outside officers are brought in.  Rather than being questioned about an incident in the distant past by someone familiar and then released back to their cells, both defendants here were interrogated by LMPD officials about a just-committed crime.  They likely showed urgency and commitment to find the perpetrator.  Taylor and Kaballah were released back to their cells; however, the present facts are distinguishable from a typical release due to the pressure and urgency of being interrogated by LMPD officials following a serious crime.

Taylor and Kaballah's situation can be further distinguished from *Howes* and *Cortez* in significant ways.  Although *Howes* provided factors to determine if someone is in custody for purposes of *Miranda,* the Court's determination that Fields was not in custody turned on additional analysis.  The Court in *Howes* emphasized that the most important factor that led to its decision that

22

Fields was not in custody was because Fields was told multiple times he was free to leave, contrary to our present facts. 565 U.S. at 515. Additionally, Fields was never placed in restraints while being interrogated, while both defendants here were handcuffed throughout the interrogation. Fields was not subject to physical force, while both defendants here had previously been ordered to lay down after a close-range blast of a percussion grenade in an enclosed room. This likely adds to the overall coercive atmosphere surrounding an interrogation that the *Miranda* court was concerned with.

In *Cortez,* the court emphasized that the defendant was not made to be uncomfortable; however, Taylor was denied food until the end of the interview, creating pressure to comply. 832 N.W.2d at 11. *Cortez* also highlighted that the defendant spoke freely and openly, whereas Taylor expressed multiple times that he was being coerced and did not want to speak. *Id.* Although the length of the questioning of Kaballah (and presumably Taylor) was significantly shorter than in *Howes*, and although both defendants were released back to their cells after the interrogation, neither of these facts are dispositive in a totality of circumstances analysis. The lack of evidence regarding their ability to terminate questioning and leave further supports that the defendants were in custody for *Miranda* purposes.

The Commonwealth has the burden to establish that no custodial interrogation took place, or that the defendant knowingly and voluntarily waived his rights. The record does not clearly establish this. The central purpose of *Miranda* warnings is to dispel coercion in a custodial interrogation

23

by ensuring that individuals know what rights they can assert.  384 U.S. at 458.  Although the interrogation here was relatively short, and the defendants were released back to their cells at the end of the interrogation, when viewing the circumstances in their totality, the atmosphere was coercive in nature, and the defendants should have been *Mirandized* prior to interrogation due to the use of force, physical restraints, the interrogation occurring directly after a crime and a raid by the SORT team, and that neither were told they were free to leave.

Nonetheless, any error was harmless.  Our harmless error standard of review for a constitutional issue is "whether the errors were harmless beyond a reasonable doubt."  *Nunn v. Commonwealth*, 461 S.W.3d 741, 750 (Ky. 2015).  Although an error occurred in failing to suppress Taylor's and Kaballah's statements due to the lack of *Miranda* warnings, the evidence used at trial from the interviews' recordings did not carry weight as to their guilt or innocence and was not a focal point of trial.[9]  Therefore, any error was harmless.

H. <u>The Showing of a Commonwealth-Produced Transcript of Taylor's Phone Call During Closing Argument was Harmless Error.</u>

During closing argument, the Commonwealth played a few of Taylor's jail house phone calls made after the attack on Weaver.  The Commonwealth apparently—although the record is not clear—placed a transcript of a portion of these calls on the overhead projector while they were being played.  Taylor's counsel objected to this transcript being used, as the phone call was hard to

---

[9] The statements introduced at trial constituted general denials and other non-incriminating information.

24

understand, and the transcript was not reproduced by a certified court reporter, but by someone from the Commonwealth's office.  On appeal, only Taylor raises this argument.  Accordingly, our review will only analyze the potential prejudice to his defense and not to defendant Kaballah's.

In *Sanborn v. Commonwealth*, we held that the trial court committed reversible error when it allowed the prosecutor to show the jury his notes and written version of a transcript of the defendant's taped statement, over the objection of defense counsel.  754 S.W.2d 534, 539 (Ky. 1988) *receded from on different grounds by Hudson v. Commonwealth*, 202 S.W.3d 17 (Ky. 2006).  The prosecutor had previously destroyed the tapes and instead presented to the jury his personal notes and interpretation of what was said.  *Id.*  This Court held that while the trial court had discretion to exclude the entire tape due to it being inaudible, it did not have the discretion to allow the jury to see the prosecutor's version of portions that are difficult to understand.  *Id.* at 540.  Rather, the jury should be able to decide for itself its interpretation of a recording.  *Id.*  The admission of the prosecutor's transcript constituted an abuse of discretion and warranted a reversal of the appellant's conviction.  *Id.*

Here, the Commonwealth presented its own version of the contents of Taylor's phone call, rather than a version created by a certified court reporter or with consultation from the defense.  In its brief, the Commonwealth argues this can be distinguished because the jury was able to listen to the call alongside the transcript, whereas in *Sanborn* the tape had been destroyed so the transcript was the only evidence available.  But this argument misreads

25

*Sanborn.* Although this Court expressed deep disappointment that the prosecutor destroyed the tapes, we did not hold that reversible error rested on the destruction of the tapes. A *Brady* violation occurred when the prosecutor destroyed evidence, but this is not a necessary pre-condition of disallowing the prosecutor's version of a tape or phone call to be shown to the jury. Rather, we held that destroying the tape was misconduct on behalf of the prosecutor **and** allowing the prosecutor's version of a transcript was an additional abuse of discretion. *Id.* Here, the jury was able to view the Commonwealth's transcript while listening to the original recorded phone-call, which constitutes error. This tainted the jury's ability to determine what Taylor discussed during the phone call, as the Commonwealth's interpretation was placed directly before the jury and the phone call was difficult to understand. This gave the Commonwealth an unfair advantage in swaying the jury in favor of one interpretation, whether or not the original recording had been destroyed.

The Commonwealth also argued that showing the transcript to the jury is akin to writing on a white board while the call is played. The Commonwealth admits, however, that the transcript is "their interpretation of the evidence." Transcribing words on a white board to highlight or emphasize their importance is distinguishable from showing an interpretation of what was said during a portion of the call that was difficult to understand. This goes beyond "highlighting" important words, and instead leads the jury to a specific interpretation as decided by the Commonwealth. In Kentucky, an attorney is not allowed to present a self-transcribed summary of what he thinks is being

26

said on a phone call or recording. This misleads the jury to hear the specific interpretation of one party. The trial court, therefore, erred in allowing the Commonwealth to present this transcript to the jury while it listened to Taylor's phone call.

Nonetheless, the trial court's error was harmless.

> The test for harmlessness [of a non-constitutional error] is whether the error substantially swayed the verdict. The inquiry is not simply whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Allen v. Commonwealth*, 395 S.W.3d 451, 467 (Ky. 2013) (citations omitted). The Commonwealth's summary was shown while Taylor's own statements were being played. The phone calls only served to supplement evidence already presented to the jury, and thus, the introduction of the transcript summary did not have a substantial influence on the verdict. Lastly, Taylor and Kaballah claim cumulative error. As only two errors occurred, however, neither of which had a substantial influence on the verdict, no cumulative error occurred.

### III.   Conclusion.

Both defendants should have been *Mirandized* prior to interrogation and the trial court should not have allowed a Commonwealth-drafted transcript to be shown during closing arguments. Nonetheless, as each error was harmless, we affirm each defendant's convictions and sentence.

All sitting. All concur.

27

COUNSEL FOR APPELLANT,
RICARDO D. TAYLOR:

Julia Karol Pearson
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLANT,
CONRAI ANDRE KABALLAH, JR.:

Jared Travis Bewley
Steven Nathan Goens
Assistant Public Advocates
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Mark Daniel Barry
Assistant Attorney General